NAMED INDIVIDUAL MEMBERS OF
the SAN ANTONIO CONSERVATION
SOCIETY, et al., Plaintiffs-Appellants,

v.

The TEXAS HIGHWAY DEPARTMENT
et al., and the United States Department
of Transportation, et al., Defendants-Appellees.

No. 30915.

United States Court of Appeals,
Fifth Circuit.

Aug. 5, 1971.

Rehearing and Rehearing En Banc
Denied Sept. 21, 1971.

John Wesley Vardaman, Jr., Williams, Connolly & Califano, Washington, D. C., for appellants.

Seagal V. Wheatley, U. S. Atty., San Antonio, Tex., Samuel D. McDaniel, Asst. Atty. Gen., Crawford C. Martin, Atty. Gen. of Texas, Austin, Tex., for State appellees.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

We enter a new battleground in this case, guided by the solemn expression of Congressional will to preserve parklands and the environment from harm or destruction at the hands of federal aid projects. This appeal challenges the construction of a six-to-eight lane federal-aid expressway through the Brackenridge-Olmos Parklands located in the City of San Antonio, Texas. It comes to us from the district court's order granting the federal and state defendants' joint motion for summary judgment and denying the appellants' motion for preliminary injunction. Since it is an appeal from a summary judgment, we have given the appellants the benefit of all favorable inferences that reasonably may be drawn from the evidence. *See* Pogue v. Great Atlantic & Pacific Tea Co., 5th Cir. 1957, 242 F.2d 575; 6 Moore's Federal Practice ¶ 56.15 [3]. So viewing the Record, we find supported therein the following long and tortuous tale of bitter controversy, which we relate along with the history of the proceedings to date in this action.

## I. Background

The controversy over this highway began in 1955 or 1956 when certain officials in the City of San Antonio first suggested to the Texas Highway Department the building of a highway from what is now the San Antonio International Airport into downtown San Antonio. The highway was to be funded on a 50–50 basis between the City of San Antonio and the State of Texas for right-of-way acquisition costs, and on a

50–50 basis between the State of Texas and the federal government for construction costs.

A period of four or five years elapsed before the first steps were taken to implement the 1955 suggestion. Then, in 1960, the Texas Highway Department prepared a report for the construction of the highway, recommending two alternate routes, one of which was the proposed present route through the Brackenridge-Olmos Parklands. In 1961, a bond issue election was held in San Antonio on the proposed acquisition of right-of-way for the new highway, which was to be called "the North Expressway." The bond issue passed by a vote of 40,799 to 23,775.[1]

In 1963, the State actually settled upon the present proposed route through the Park, and at that time for the purpose of obtaining federal aid in the construction of the highway, the State conducted a Public Hearing on the "North Expressway," as required by 23 U.S.C.A. § 128.[2] In 1964, the Bureau of Public

[1]. The proposition that was presented to the voters of San Antonio described the subject highway simply as "a North Expressway to be constructed from the east leg of the Expressway west of Broadway to U.S. Highway No. 281 north of Loop 13." No particular route was otherwise specified on the proposition as it appeared on the voters' ballots. The state defendants have entered certain exhibits in the Record, in the form of newspaper clippings, which indicate that even at this early date the proposed route, which had not yet been unequivocally settled upon, was highly controversial. One of the clippings tells the following story:

> Several women members of the Conserve Our Parks Committee, opponents of the proposed N. Expressway to be voted on in the election, were ordered out of Brackenridge Park Tuesday after they attempted to erect a signboard near the Sunken Garden on Alpine Dr.
> The five foot sign read: "This is the view you will see of the Sunken Garden." Officials said the sign apparently was meant to represent a fence planned to deaden sound of traffic if the expressway were routed through the park.

*San Antonio Express*, Dec. 28, 1960, at 8A.

The State relies on this clipping, and others, to show that the voters of San Antonio knew what they were voting on when they voted on the Bond issue in 1961. Thus, they seem to argue, since the voters of San Antonio decided to finance part of the right-of-way for this highway in 1961, the controversy ended at that point, and we should defer to that determination. Even if the voters of San Antonio did know what they were voting on, however, the bond issue election was only the first step in a long series of steps necessary to obtain approval for the highway; as such it was but the first battle in the long war over this highway. And, as the history of this case demonstrates so vividly, the war is not over until the last battle has been won.

*See also* note 23 *infra*.

[2]. 23 U.S.C.A. § 128 provided at that time that (a) [a]ny State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic effects of such a location. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway.

(b) When hearings have been held under subsection (a), the State department shall submit a copy of the transcript of said hearings to the Secretary, together with the certification. Section 128 has since been amended to provide as follows:

§ 128. Public hearings

(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated

Roads, a federal agency then in charge of supervising federally-funded highways, notified the State Highway Engineer that "insofar as public hearings are concerned, [we] will approve the successive steps in the development of this section of the highway." [3] Another three years elapsed during which the City of San Antonio litigated and negotiated for the acquisition of certain portions of the proposed right of way owned or abutted by private persons.[4] Then, in 1967, the San Antonio Conservation Society requested the City Council to seek rerouting of the North Expressway in order to save the Park. The City Council denied their request. Thereafter, in December 1967, the San Antonio Conservation Society filed this action and also sought through administrative appeals in the Department of Transportation and in other federal agencies, to persuade the Secretary of Transportation to withhold federal approval of the project. In January 1968, the Secretary of Transportation stated to the district court, in an affidavit filed by an official of the Bureau of Public Roads, that, as of that time, no federal approval had been given to this highway project referred to as the North Expressway.[5] In April 1968, the then Secretary Boyd asked that an analysis of the highway be prepared and, by telegram, requested that the district court take no

action in the case until he had acted on the Conservation Society's appeals.

On September 23, 1968, the Department of Transportation issued a press release stating that Secretary Boyd "today announced conditional approval" of the State's request but the release stated specifically that "no part of the project will be approved until after [certain] design changes have been submitted to and approved by the Federal Highway Administration's Bureau of Public Roads." [6] This "conditional approval" never became final, however, because in February 1969 the State rejected the design changes requested by Secretary Boyd.

Following the State's refusal to accept Secretary Boyd's conditional approval, there were further meetings and discussions between those opposing the route and the Department of Transportation. On December 23, 1969, the Department of Transportation issued a press release which stated that the new Secretary Volpe "could not justify approval for construction of the North Expressway between Mulberry and Tuxedo Avenue [Mulberry being the southern border of Brackenridge Park, and Tuxedo being a northern boundary of the Olmos Basin Parklands]." He called for a further study of this "middle segment." With

by the community. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway.

3. *See* note 23 *infra.*

4. For related history *see* City of San Antonio v. Congregation of Sisters of Charity, 360 S.W.2d 580 (Tex.Civ.App.—Waco 1962, no writ) cert. denied, 372 U.S. 967, 83 S.Ct. 1093, 10 L.Ed.2d 131 (1963); City of San Antonio v. Congregation of Sisters of Charity, 404 S.W.2d 333 (Tex. Civ.App.—Eastland 1966, no writ).

5. The affidavit reads in pertinent part as follows:
 [A]s to U.S. 281 (referred to as the North Expressway), there has been no approval by the Department of Transportation, the Federal Highway Administration or the Bureau of Public Roads of any Federal-aid funds for right-of-way acquisition or construction * * *.

6. At the time the Secretary announced this conditional approval, he also notified counsel for the San Antonio Conservation Society that "our approval of the project is not final, but rather is conditional upon the Texas State Highway Department making four design changes which must first be submitted to and approved by the Federal Highway Administration."

respect to the two "end segments," however, the press release stated:

> Authorization will be given to the Texas Highway Department to construct those segments north of Tuxedo Avenue and south of Mulberry Avenue as soon as an agreement is reached to study an alternative route for the remaining segment.

As it had done with Secretary Boyd's conditional approval, the State also rejected Secretary Volpe's conditional approval, and in January 1970 made a counteroffer containing some conditions of its own on the Secretary's enforcement powers.[7] The Secretary rejected the States' proposal,[8] and the Department of Transportation advised that unless the State agreed to the conditions originally proposed, the Secretary's conditional approval of the two end segments "must be withdrawn." In April 1970 the State of Texas responded that the Texas Highway Department "respectfully declines to make the study * * *" It maintained that no further study was necessary because there were no alternatives. At this point, the appellants relaxed, thinking that, with the State refusing to meet the Secretary's conditions, "the battle for the Park had been won."[9]

All was quiet[10] for a period of months, until August 4, 1970, when the Texas Highway Department agreed to the proposed study of the "middle segment" on the condition that federal funds would be made available for the two "end segments." On August 13, 1970, the Secretary, apparently without notice to the plaintiffs in the then pending suit challenging the North Expressway, authorized construction of the two "end segments" and an agreement was reached that an independent consultant would study alternatives to the "middle segment." On August 24, 1970, the State Highway Engineer was notified that he was authorized to advertise for bids. On September 1, 1970, the appellants revived their pending action in the court below, claiming that they had found out about the Secretary's action only through the newspaper; that the Secretary's action was in violation of the Department of Transportation Act of 1966, the Federal Aid to Highway Act of 1968, and the National Environmental Policy Act of 1969; and that they needed immediate protection to preserve the status quo, since the state defendants had filed notices of contract letting proposing to an-

---

7. In its counteroffer, the State offered "to *initiate* studies and preparation of detailed cost estimates for that portion of the project between Mulberry and Tuxedo and to construct with Federal participation the sections north of Tuxedo and south of Mulberry," (emphasis added) but it stipulated that if the State could not "reach agreement with the Department of Transportation within six months after submission of the study to the DOT, the State of Texas will be free to proceed with construction on the section between Mulberry and Tuxedo with whatever funds may be available."

8. The Federal Highway Administrator's response, rejecting the State's counteroffer, is instructive. He stated:
 The Secretary will not approve funds for the noncontroversial segments pursuant to any understanding *that would permit the Texas Highway Department to complete the North Expressway along a route ineligible for Federal participation.* (Emphasis added)

9. The appellants have entered in this Record an exhibit of some irony—a speech made by the Secretary of Transportation on "Earth Day" April 22, 1970, in which the Secretary, extolling the Department of Transportation's commitment to the preservation of parklands, stated, "We have made decisions in other areas—we saved a park in Memphis, Tennessee; another in San Antonio, Texas."

10. Except for a rather critical meeting held on July 22, 1970, in Secretary Volpe's Washington office, attended by the Mayor of San Antonio, Texas, United States Senator John Tower, officials of the Texas Highway Department and the Federal Highway Administrator. The appellants were not represented at this meeting. They complained below that they received no notice of it, and there is no denial of that claim. Yet, it was at this meeting that the principal decision which is the subject of this appeal was formulated.

**1018**

nounce contract specifications on September 1 and September 8, 1970. No reply to this motion for interlocutory relief even was filed by the defendants until September 10, 1970, and the district court took no action on the appellants' motion for interlocutory relief until after the bids on the southern segment of the project had been made public sometime around September 20.[11] The matter was finally heard on the parties' opposing motions for summary judgment on November 12, 1970. On November 13, 1970, the district court denied appellants' motion for preliminary injunction, granted the defendants' joint motion for summary judgment insofar as the construction of the two "end segments" of the

---

11. The date on which the contract bids were made public assumed considerable significance in this case because the opening of the bids triggered the tolling of a sixty day statutory period, in which the State had either to act on the bids or forfeit them. The bids on the southern "segment" of the Project were due to expire on November 20, 1970. Bids on the northern "segment" were due to expire a month later. Thus, when the appellants' first motion for stay pending appeal was presented to this Court on November 17, 1970 (discussed *infra*), only two days remained before the sixty-day period on the southern "segment" would expire. Likewise, the expiration date on the northern "segment" occurred somewhere around December 20, 1970, two days after the Supreme Court vacated its stay order in this case, (also discussed *infra*). The state and federal defendants relied heavily on these impending deadlines in opposing the appellants' stay motions, contending that a stay would cause irreparable harm to the low bidders, who would lose their advantageous positions, and to the State, since "rebidding probably would result in increased costs to * * * [the defendants]."

It is not clear to us why the district court failed to act immediately—one way or the other—upon the plaintiffs' motion for interlocutory relief, which was presented well in advance of the date on which the first bids were made public. The district court did hold a hearing on September 10, 1970, but announced no decision at that time on the appellants' motion for an injunction. A transcript of that hearing appears in the Record. It reveals that the district court set the matter for a hearing on the merits on October 19, almost a full month after the bids would have been made public. This date was set *at the request of the defendants*.

Thereafter, on October 8, 1970, the plaintiffs did file a motion for continuance because the defendants had failed to supply the plaintiffs with requested information concerning the Secretary's review of the project. There is no indication that this motion was ever acted on, but the Record does reveal that a subsequent motion for continuance filed by the state and federal defendants for additional time to file supporting documents to their joint motion for summary judgment was granted on October 16, 1970, causing the hearing set for October 19 to be moved up to October 28. At the hearing on October 28, the plaintiffs renewed their October 8 motion for continuance, contending that it had been on file for two weeks, that no response had been received from the defendants, and that they were still without the needed information concerning the Secretary's review of the project. The Court granted this motion for continuance, and reset the case for November 12, 1970.

We remark on this sequence of events only because we recall that on November 17, 1970, when this Court was presented with the appellants' first motion for stay two days before the bids were due to expire on the southern "segment," the state and federal defendants, in opposing the motion represented to this Court that the "nearness of hearing and judgment to the date for letting of contracts for construction was caused by a continuance of hearing granted at the request of petitioners;" that the last minute nature of the relief sought was "petitioners' fault;" and that at the September 10, 1970 hearing, "petitioners were not ready for trial."

We now find, upon reading the papers filed and the transcript of hearing below —which were not available to the Court in November—that these representations were not entirely supported by the Record. In the first place, it was the defendants, not the plaintiffs, who requested that the matter be postponed at the September 10 hearing. Indeed, the transcript of that hearing reveals that when the district court asked the plaintiffs whether they would agree to a postponed hearing, counsel for the plaintiffs, laboring under an apparent misunderstanding that the hearing on the

freeway was concerned, and retained jurisdiction over the case to hear and consider the complaints of the plaintiffs concerning the "middle segment." On November 16, the appellants filed a motion for stay pending appeal in this Court. This Court received the motion on November 17, 1970, and on November 18, 1970, denied the motion. On November 19 or 20, the State awarded the contracts to the low bidders and shortly thereafter construction on the southern segment commenced. On November 25, 1970, the President of the San Antonio Conservation Society wrote the Secretary of Transportation that the Society had, by Board action, dismissed all litigation on the North Expressway. Said the letter, "[I]t was a difficult decision to make but, in light of recent court action, it appeared to be the only reasonable choice at this time. Of course, we continue to deplore the possibility of desecration of public parklands by the route of this expressway."

■ Nevertheless, some members of the Conservation Society, disgruntled with the Board's action, decided to continue the suit, and thus came their present style, "Named Individual Members of the San Antonio Conservation Society." [12] The "Named Individuals" then applied to Mr. Justice Black for a stay. The Justice referred the matter to the entire Supreme Court, and the Court on December 7 granted the motion for stay on condition that "a petition for a writ of certiorari, before judgment, is filed in this Court by December 14, 1970." San Antonio Conservation Society v. Texas Highway Department, 400 U.S. 939, 91 S.Ct. 231, 27 L.Ed.2d 262 (1970). Accordingly, on December 14, 1970, the appellants filed a petition for certiorari, before judgment and on December 18, 1970, over the dissents of four Justices, the Supreme Court vacated its stay. Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 400 U.S. 961, 91 S.Ct. 361, 27 L.Ed.2d 381 (1970). Subsequently, on December 21, 1970, the Supreme Court denied certiorari, 400 U.S. 968, 91 S.Ct. 368, 27 L.Ed.2d 388 (1970). On March 2, 1971, the Supreme Court handed down its decision in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and soon thereafter, the persevering remnant of the otherwise

---

merits would be a hearing not on the two "end segments," but on the whole project, stated the following:

> Your honor, our motion, it sounds like, is virtually granted. They are willing to sit down and try this case * * *. We think—I think this case can be presented in full, and, in fact, *we can present it right now*, we feel, but to give them a chance to pull their case together, and *we are ready to proceed*. (Emphasis added)

Furthermore, it appears that the plaintiffs' motion for continuance was not filed until October 8, after the contract bids had been made public, and that the reason for their motion was the defendants' continued refusal to supply them with requested information. Finally, we notice that the defendants themselves contributed to the delay with their own motion for extra time to prepare their supporting documents.

12. Although the state defendants have sought to make an issue of the Society Board's vote to discontinue the Society's participation in this suit, we see no reason why that vote should have any bearing on the appellants' right to continue. In the first place, both the original and supplemental complaints in this case were filed in the name of the San Antonio Conservation Society *"and individual members thereof."* It frequently occurs, of course, that some parties to a lawsuit decide to quit at the trial level, while others determine to take an appeal. Secondly, the appellants' motion for stay was received in the Supreme Court, granted for a time, and while the petition for certiorari before judgment was denied, the appeal was not dismissed, as the defendants assert it should be here. Finally, a list of the named individuals who are carrying on this suit has been supplied to both the Supreme Court and to this Court. There is no merit, therefore, to the State's argument that members of the San Antonio Conservation Society may not carry on this suit in their own names after the Board of the Society has voted to discontinue its role in the litigation.

litigation-weary San Antonio Conservation Society returned to this Court seeking reconsideration of our original denial of their motion for stay on grounds that conditions had now changed, and that the *Overton Park* decision compelled reversal of the district court's action in this case. Because the appellants were claiming that changed conditions warranted their reapplication for stay, we required them to reapply first to the district court for a stay, in compliance with F.R.A.P., Rule 8(a). The district court denied their motion on May 11, 1971, and they returned to this Court on May 18. After reviewing the file in the case, and studying the *Overton Park* decision, we concluded that this case is in all essential respects controlled by *Overton Park*, and we granted the appellants' motion for stay on May 27.

The entry of our stay order precipitated a virtual barrage of motions from the state and federal defendants seeking reconsideration of our stay order and a stay of the mandate on the order until they could seek relief in the Supreme Court. On Memorial Day, May 31, 1971, the state and federal defendants presented their motions to a single member of this Panel, Judge Clark, in Jackson, Mississippi. On that day, Judge Clark entered a single judge order modifying our stay order to permit the contractors to continue with construction for one week, and then to proceed with "an orderly deactivation of each of * * * [the construction] projects in such a manner as to preserve the work actually accomplished and as may be necessary to prevent soil erosion and maintain public safety." On June 1, 1971, the full Panel considered the state and federal defendants' motions, and on June 2, 1971 entered an order staying for a period of 15 days the mandate on our order of May 27,

but only insofar as it applied to the State, in order that the State might seek relief in the Supreme Court. The State filed its motion for relief in the Supreme Court some 10 days later, and on June 21, 1971, it was unanimously denied by the Supreme Court. Texas Highway Department v. Named Individual Members of the San Antonio Conservation Society, 403 U.S. 932, 91 S.Ct. 2257, 29 L. Ed.2d 711. The state and federal defendants immediately filed motions to expedite the appeal. We granted their motions, and set the matter down for hearing in New Orleans at the earliest possible date.

After hearing oral argument and studying the case on its merits, we remain convinced that our stay order of May 27 was completely justified by the *Overton Park* decision, and for the reasons stated herein, we reverse the judgment of the district court and remand the case for further proceedings in strict accordance with this opinion.

## II. Preservation of Parklands

The Brackenridge-Olmos Basin Parklands are unique park and recreation areas situated at the headwaters of the San Antonio River and surrounded by a densely populated urban area in San Antonio, Texas. The Parklands contain Sunken Gardens, an open air theatre, two golf courses, the San Antonio Zoo, picinic areas, nature trails, and many acres of green, open space. While there is a factual dispute concerning the exact number of acres threatened by this proposed expressway,[13] it appears that the expressway will require the use of between 116 and 250 acres of parkland.

In recent years, the Congress of the United States has enacted several statutes designed to preserve just such parks as this from destruction by massive fed-

13. This is one of several factual disputes emerging from the pleadings and affidavits filed in the court below, where summary judgment was entered. Not all the factual discrepancies arising from the pleadings and affidavits, however, concerned material issues. For example, this issue of exactly how many acres of parkland are to be taken is immaterial for summary judgment purposes because it is clear that *some* parkland has been, or is to be, used. The relevant statutes in this case apply to projects which require the use of *ANY* parkland. *See, e. g.,* 23 U.S.C.A. § 138 (Supp.1971).

eral projects.[14] Specifically, we deal with three such statutes in this case: (1) Section 4(f) of the Department of Transportation Act of 1966, 23 U.S.C.A. § 138 (Supp.1971), which provides as follows:

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

(2) Section 138 of the Federal Aid to Highway Act of 1968, 49 U.S.C.A. § 1653(f) (Supp.1971) which provides as follows:[15]

(f) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

(3) Section 102(2) of the National Environmental Policy Act of 1969, which provides in pertinent part, that [16]

all agencies of the Federal Government shall

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for leg-

---

14. Indeed, the legislative history of section 4(f) reveals that the Brackenridge Park controversy was foremost in the minds of the Senators as they debated this Act and rejected a House amendment that was specifically designed to allow federal participation in the North Expressway. The Senate version prevailed. *Compare* 114 Cong.Rec. 90th Cong. 2d Sess., 19914, 19915 with 114 Cong.Rec. 90th Cong. 2d Sess., 24023, 24032 (1968).

15. Since section 138 of the Federal Aid to Highway Act tracks, almost word for word, section 4(f) of the Department of Transportation Act of 1966, our references to section 4(f) hereinafter should be construed to include a reference to section 138 of the Federal Aid to Highway Act.

16. 42 U.S.C.A. § 4332 (Supp.1971).

islation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

It is these statutes which, through our judgment, we enforce herein.

### III. Noncompliance with the Statutory Law

Our task is simplified greatly to begin with because it is undisputed that the Secretary of Transportation complied with none of the above-quoted statutes in his approval of the two "end segments" of this expressway. No environmental

study under N.E.P.A. has been made with respect to these two "end segments," and the Secretary has demonstrated no effort by anyone to examine the section 4(f) "feasible and prudent" alternatives to the route followed by these two "end segments," which come right up to, if not in to, the Parklands from both the north and the south. Thus, it requires no discussion to establish that there has been no compliance with any of the above-quoted statutes.

Instead, we must devote our efforts to examining the numerous defenses [17] raised by the federal and state defendants seeking to establish their positions that for various reasons these statutes do not apply to the North Expressway.

### IV. Division of the North Expressway into Three Segments

Both the state and federal defendants argue that section 4(f) does not apply to this case because the construction of the two "end segments" involves no taking of parkland, and because there is nothing unlawful in the Secretary's division of the project into three "segments" for purposes of section 4(f) approval.

 In the first place, there is a factual dispute between the parties over whether any parkland is taken by the two "end segments." If that issue were material therefore, the mere existence of a disputed fact manifestly would require us to reverse the district court's summary judgment, since summary judgment is always improper when there are disputed issues of material fact. We have determined, however, that it is unnecessary to base our decision on the existence of a factual dispute over whether parklands are taken by the two "end segments," because we have concluded that the Secretary's division of the project into three "segments," for purposes of giving his approval to the two "end segments," was unauthorized by section 4(f). Section 4(f) provides that "the Secretary *shall not approve* any * * *

---

17. We have discussed in the text only the major contentions of the federal and state defendants. We have treated other of their defenses in footnotes. Their

remaining defenses have been considered and disposed of without comment on grounds that they lack merit and warrant no discussion.

*project* which requires the use of any publicly owned land from a public park. * * * " Section 4(f) does not authorize the Secretary to separate a "project" into "segments." In short, the Secretary acted beyond the scope of his authority and in violation of section 4(f) when he approved "segments" of a project before he had complied with his section 4 (f) responsibilities.[18]

We note that the word "project" becomes a key word in the statute on this point. While it is conceivable that in other cases the question of how broadly the Secretary must define "project" may be presented, that question is not, and never has been, presented in this case.[19] There is nothing in this Record to support the conclusion that the North Expressway has ever been anything but one project for purposes of federal approval. It has consistently been denominated the "North Expressway." It was presented as a single project at the Public Hearing in 1963. The state defendants presented it to the federal defendants as a single project for federal participation. And indeed the Secretary's attempt to condition federal approval of the entire project on a section 4(f) study of the middle "segment" demonstrates that he has construed it as one "project" for purposes of section 4(f).

The question therefore, is whether the Secretary may take a single "project" and divide it into "segments" for purposes of section 4(f) approval. We

have already stated that such fragmentation of a "project" is unauthorized by section 4(f). But there is another reason why we refuse to authorize such action: The frustrating effect such piecemeal administrative approvals would have on the vitality of section 4(f) is plain for any man to see. Patently, the construction of these two "end segments" to the very border, if not into, the Parklands, will make destruction of further parklands inevitable, or, at least, will severely limit the number of "feasible and prudent" alternatives to avoiding the Park. The Secretary's approach to his section 4(f) responsibilities thus makes a joke of the "feasible and prudent alternatives" standard, and we not only decline to give such an approach our imprimatur, we specifically declare it unlawful.[20]

At this point, we would comment on one final argument made by the Secretary in defense of his piecemeal approval. He contends that the appellants' argument against piecemeal approval depends for success "on innuendos, utter bad faith, and some conspiracy type of clandestine activity on the part of the Secretary * * * to build this highway, 'come hell or high water.'" The appellants' brief, however, makes no charges of conspiracy or clandestine activity on the part of the Secretary. And the Secretary is wrong if he is suggesting that a finding of "bad faith" is essential to support a holding that he violated the applicable law in this case. By

---

18. The defendants argue that there is "no law which would prohibit" the Secretary from dividing the projects into three segments. This argument misses the point. The Secretary is not so omnipotent that he must be presumed to possess power to act as he chooses unless there is some law prohibiting him from so acting. He possesses only the power which Congress has given him, and the scope of that power is defined by Congress. His action is specifically reviewable under the Federal Administrative Procedure Act, 5 U.S. C.A. § 706(2) (C) for being "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

19. The federal defendants purport to rely on the letting of the contracts in "segments" as evidence that the project "had always been divided into three segments." This, of course, is of no probative value since the letting of the contracts occurred after, not before, the Secretary's decision to fragment the project.

20. The type of piecemeal planning evident here has been held unlawful in other cases. *See* Citizens Committee for Hudson Valley v. Volpe, S.D.N.Y.1969, 302 F.Supp. 1083, aff'd 2 Cir., 425 F.2d 97, cert. denied, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970); D.C. Federation of Civic Ass'ns v. Volpe, 316 F.Supp. 754 (D.D.C.1970).

the Secretary's own admission,[21] he adopted this piecemeal solution in order to defuse a controversial situation by attempting to strike a compromise between those who were determined to build the highway and those who were determined to save the Park. The problem with the Secretary's solution to the controversy is that he misconceived his role. The conflict between Parklands and Highways has *already* been resolved in the Halls of Congress, which is the proper place in our system of Government for priority decisions to be made. And, as the statutes here in question make clear, parklands and environmental values are considered paramount. *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 411–412, 91 S.Ct. at 821–822, 28 L.Ed.2d at 150–151 (1971).

## V. National Environmental Policy Act of 1969

Both the federal and state defendants argue that NEPA has no application to this Project. The federal defendants' position, however, is predicated on their argument that the division of the Project into segments was permissible, and that since the two end segments involved no taking of parklands, NEPA did not apply. We have already dealt with, and rejected, this argument. We proceed, therefore, to the State's arguments.

Section 102(2) of the National Environmental Policy Act of 1969, 42 U.S. C.A. § 4332 (Supp.1971), requires "all agencies of the federal government * * [to] include in every recommendation or report on proposals for * * * major federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

It is undisputed that no section 102(2) statement has been prepared or filed by anyone in this case. The State argues none was required because (a) federal authorization of a federal-aid highway is not a "recommendation" within the meaning of section 102(2); (b) there is no one for the Secretary to make his report or recommendation to; and (c) "approval of a section of a roadway in Texas" is not a major federal action within the meaning of the statute.

The legislative history of NEPA and the language of the statute itself refute each of these arguments. That federal-aid highways were among the federal actions affecting the human environment, and therefore covered by the Act, can be seen from the hearings and debates over the Act. "Super-highways" were pointedly cited among the list of modern phenomena threatening the environment. *See* 115 Cong.Rec. 91st Cong., 1st Sess., 29068 (1970). And the Department of Transportation was asked to send, and did send, a representative to testify at the Senate hearings on the Act.[22]

To the State's argument that there is no one for the Secretary to file a state-

---

21. The Secretary states in his brief that he acted "to satisfy the various competing interests in the total highway * * * [and] to approve construction of the two ends * * * where the controversy centered on the middle section."

22. At the Senate Hearings, DOT was represented by the Assistant Secretary for Urban Systems and Environment, who stated the following:

I think that perhaps the reason that the Department of Transportation was

ment with, the language of section 102 (2) provides an answer: "[c]opies of * * * [the] statement * * * shall be made available to the President, the Council on Environmental Quality, and to the public * * * and shall accompany the proposal through the existing review processes. * * * "

Finally, the State's argument that this is not a major federal action seems doubtful. It has been estimated that the project ultimately will cost a total of $18,000,000.00. Total *initial* costs, according to the defendants' pleadings, were projected *in 1960* at $12,600,000.00, of which half was to be funded by the federal government. Without belaboring the point, we conclude that we have no difficulty in characterizing a project of this size as "major."

▮ The State also argues that NEPA does not apply to this Project because NEPA cannot be applied retroactively. The simple answer to this contention is that no retroactivity would be involved in the application of NEPA to

this case. NEPA was the law at the time the Secretary authorized federal funding of the two "end segments" of the North Expressway on August 13, 1970, and it had been the law since January 1, 1970.[23]

We move next to two defenses presented by the State in which the federal defendants do not participate.

## VI. Are the Brackenridge-Olmos Parklands of Local Significance?

Section 4(f) of the Department of Transportation Act protects from federal-aid highway parks "of local significance as determined by the Federal, State or local officials having jurisdiction thereof. * * * * "

After section 4(f) was passed and became effective, the City Council of San Antonio passed the following resolution:

The portions of public lands owned by the City of San Antonio and required by present plans for the construction of this expressway facility

---

asked to have a representative here before your Committee was because *within the purview of the Department of Transportation has lain in the past and will continue to lie in the future many of the activities that at least, are most apparent to the people of the country in the field of environmental impact.*

Hearings Before the Committee on Interior and Insular Affairs, United States Senate, 91st Cong., 1st Sess., on S. 1075, S. 237. (emphasis added) at 76 (1969).

23. The State has argued throughout its brief that because of the completion before NEPA and section 4(f) of certain steps in the process of obtaining approval of this North Expressway, it is now too late to apply those statutes to this case. Specifically, the State has relied on the bond issue election in 1961, note 1 *supra*, the Bureau of Public Roads approval of the Public Hearing in 1963, *supra*, note 3, and the acquisition of part of the right-of-way. As we pointed out in note 1, *supra*, the legality of this Project has been contested from its inception, and the contest has been an ongoing one. The Secretary's approval of the Project for federal funding was the last step in the process; subject, of course, to judicial re-

view. And since the Secretary's approval came on August 13, 1970, that date becomes the operative date for determining what law should apply in this case. This much is clear from the *Overton Park* case, which, as the State has admitted, note 25 *infra*, is "strikingly similar" to the instant case. In *Overton Park*, the Bureau of Public Roads had given route approval in 1956; local officials had already made a determination to go through the Park; and acquisition of right-of-way had been approved in 1967.

We recognize, of course, that there have been several cases which have declined to apply NEPA retroactively. *See* Investment Syndicates, Inc. v. Richmond, D.Or.1970, 318 F.Supp. 1038; Brooks v. Volpe, W.D.Wash.1970, 319 F.Supp. 90 (1970); Pennsylvania Environmental Council, Inc. v. Bartlett, M.D.Pa.1970, 315 F.Supp. 238. In each of these cases, however, the critical act of federal approval of the challenged project had come prior to the effective date of NEPA, January 1, 1970. In *Bartlett*, the project was approved on November 20, 1969; in *Richmond*, Congress had approved the project in 1967; and in *Brooks*, the critical determination had been made in 1967.

are of *primary local significance* as part of the right of way for the North Expressway and of *secondary local significance* as parts of park and recreation areas.[24] (Emphasis in original).

█ The State argues that this resolution is a determination by local officials that Brackenridge Park is of "no local significance." The Resolution, however, does not say that Brackenridge Park is of no local significance. Indeed, it says that Brackenridge Park *is* of local significance as a Park, but that the City Council would prefer to see it used for a highway. The question, therefore, is whether Congress intended to leave the choice between parks of local significance and federal-aid highways to local authorities; or whether Congress, in passing section 4(f), has already made the choice between the two uses. Only one construction fairly can be given to section 4(f), and that is that Congress itself has made the choice between the two uses. Clearly, Congress did not intend to leave the decision whether federal funds would be used to build highways through parks of local significance up to the city councils across the nation. If there was any doubt about this question before *Overton Park*, there most assuredly is no longer any doubt.

The following appears in the district court's opinion in *Overton Park*:

With respect to the reference to "* * * local preference," * * * it should here be pointed out that the Mayor and Council of the City of Memphis have heretofore approved this corridor and design and have approved the sale of this strip through Overton Park to the State of Tennessee. * * Since [section 4(f)] by its terms is invoked only if park "is of local significance as determined by Federal, State or local officials having jurisdiction thereof" in view of the approval by the Mayor and Council, it may well be that [section 4(f)] has no application here.

Citizens to Preserve Overton Park, Inc. v. Volpe, W.D.Tenn.1970, 309 F.Supp. 1189, 1195.

The Record in this case reveals that the state defendants relied heavily on this district court opinion in opposing application of section 4(f) to the North Expressway.[25] Now, of course, that argument is foreclosed by the Supreme Court's decision in reversing the district court in *Overton Park*. We must conclude from the Supreme Court's action that the Court attached little if any significance to the local officials' preference

---

24. The Resolution was a transparent attempt to by-pass section 4(f).
Among the "whereas" clauses, we find the following:
Whereas, the Congress of the United States of America in 1968 amended section 4(f) of the Department of Transportation Act and Section 138 of Title 23 of the United States Code so as to include identical declarations of policy in each instance, reading in part as follows * * * [whereafter section 4(f) is quoted]
Shortly thereafter followed the resolution quoted in the text above.

25. The following language appears in a letter dated April 7, 1970 from Chairman Greer of the Texas Highway Commission to Mr. Francis C. Turner, the Federal Highway Administrator:
* * * due recognition should be given to the fact that courts in other areas of

the country have already ruled in favor of Highway Departments in cases raising the same objections as continue to be repeated by the San Antonio Conservation Society. We refer specifically to the * * * [case] * * * involving the Overton Park in Memphis.
*The situation in Memphis, as we understand it, is strikingly similar to our situation in San Antonio in the following respects:*
A. Both route locations were established long before Congress made any provision for preservation of parklands in federal highway laws.
B. Much of the right of way had been acquired prior to the time the active legal controversy arose.
C. The Mayor and City Council * * * had approved the route location.
D. Remedial measures had already been taken to restore areas and facilities taken from the parks involved.

to use Overton Park for highway right-of-way.[26]

## VII. May the State Now Proceed with this Project Using its Own Funds?

The State argues that it is "absolutely committed" to building the North Expressway regardless of what this Court decides about the validity of the Secretary's action, and that this Court has no power to require the State to comply with the law in building the Project because the State is determined to build the highway with its own funds, "if necessary." In connection with this argument, the State has presented this Court with a document which was not part of the Record on appeal, but which deserves reproduction in this opinion. The document is a Minute Order of the Texas Highway Department, passed on June 1, 1971, five days *after* this Court entered its stay order of May 27, 1971:

> WHEREAS, there is presently pending on appeal in the United States Court of Appeals for the Fifth Circuit, Cause No. 30915 styled, Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department, et al, and The Department of Transportation, et al, and there is some apparent doubt concerning whether a stay of highway construction should be effected, in part because of apparent doubt concerning the nature of the State's commitment to construct the highway involved; and, because such doubt should not exist;
>
> THEREFORE, IT IT HEREBY AFFIRMED that the commitment of the State of Texas made by this Commission to build said highway, *is absolute.* The highway will be built with 100% state money if necessary. While this Commission continues to believe that this highway is eligible for federal

funding, such eligibility is neither determinative of whether or not the highway will be built, nor of the schedule of its construction.

> FURTHERMORE, the construction contracts authorized by this Commission in the Fall of 1970, under which construction is presently proceeding on the end segments of the highway, are in no way contingent upon federal funding. (Emphasis in original)

In addition to presenting us with the foregoing "Minute Order," the State argued before the Supreme Court in its petition for relief from our stay order, and repeated before this Court, the following:

> In all candor, it must be admitted that in the event the Secretary of Transportation or the Courts, should rule that federal law prohibits federal participation in the "North Expressway" construction project, other eligible projects will be submitted to take up available federal funding.

We are not impressed with this argument. If we were to accept it, we would be giving approval to the circumvention of an Act of Congress. The North Expressway is now a federal project, and it has been a federal project since the Secretary of Transportation authorized federal participation in the project on August 13, 1970. As such, the North Expressway is subject to the laws of Congress, and the State as a partner in the construction of the project is bound by those laws.[27] The supremacy of federal law has been recognized as a fundamental principle of our Government since the birth of the Republic. United States Constitution, Art. VI, cl. 2. The State may not subvert that principle by a mere change in bookkeeping or by shifting funds from one project to another.

---

26. The Supreme Court was clearly aware of the Memphis City Council's decision in *Overton Park.* See 401 U.S. at 408, 91 S.Ct. at 819, 28 L.Ed.2d at 148.

27. This principle has been characterized as "beyond challenge" by the Supreme Court. *See* Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 295, 78 S.Ct. 1174, 1185, 2 L.Ed.2d 1313 (1958).

The State seems to contend that the North Expressway is not yet a federal project because, at the time of oral argument, no federal funds had exchanged hands between the federal and state defendants.[28] This argument misses the point. The point is that on August 13, 1970 the Secretary of Transportation, at the State's request, authorized federal participation in the North Expressway. That authorization triggered the advertisement for contract bids, the letting of contracts, and the commencement of construction that has erected almost ⅓ of the southern "segment" of the North Expressway. No one forced the State to seek federal funding, to accept federal participation, or to commence construction of a federal aid highway. The State, by entering into this venture, voluntarily submitted itself to federal law. It entered with its eyes open, having more than adequate warning of the controversial nature of the project and of the applicable law. And while this marriage between the federal and state defendants seems to have been an unhappy one, it has produced an already huge concrete offspring whose existence it is impossible for us to ignore.[29]

In short, the state, as well as the federal defendants must comply with the law in the completion of the North Expressway.

## VIII. Conclusion

The district court erred in granting a summary judgment in favor of the federal and state defendants before the Secretary of Transportation had complied with his statutory responsibilities under 23 U.S.C.A. § 138 (Supp.1971); 42 U.S.C.A. § 4332 (Supp.1971); and 49 U.S.C.A. § 1653(f) (Supp.1971). That judgment is now reversed, and the case is remanded with directions to hold the case until the Secretary has completed his administrative review of the North Expressway as one project under the law. Once the Secretary has completed his re-

---

**28.** The Record in this case reveals that the Secretary of Transportation himself is partially to blame for the State's belief that it may so easily circumvent section 4(f). It appears that at the July 22, 1970 meeting in Secretary Volpe's office, the Secretary agreed that if the State refused to comply with the Secretary's recommendations after the section 4(f) study on the middle "segment" had been completed, the State could then withdraw from the Project and complete it with state funds. This action by the Secretary, coming with his authorization which triggered the commencement of construction on the two "end segments" leading into the Park, was a clear abdication of his section 4(f) responsibilities. The obvious purpose of requiring federal approval of a project *before* federal funding will be allowed is to induce in the construction of the project compliance with some Congressional purpose—like preservation of parklands. *Compare* Air Line Pilots Ass'n v. Department of Transportation, 5th Cir. 1971, 446 F.2d 236. The Secretary's action thwarted the very purpose of section 4 (f) and ignored the will of Congress. We note how sharply it contrasts with his original position in February 1970, when he refused to approve *any action* that would permit the Texas Highway Department to complete the North Expressway along a route ineligible for federal participation. *See* note 8 *supra*. He evidenced a much better understanding of his responsibilities under the law in February than he did in July.

**29.** At oral argument in this case, the State argued that construction of the two end segments of the North Expressway has proceeded as far as it has "largely because of this Court's and the Supreme Court's actions in November and December of last year." We would remind the State, however, that this case has *never* been presented to this Court or the Supreme Court when things had not gone so far that the granting of a stay would not have resulted in considerable financial loss to the defendants. *See* note 11 *supra*. Moreover, we would point out to the State that it was neither this Court nor the Supreme Court, but rather the defendants, who made the decision to commit large sums of public money to a highly controversial project, *the legality of which was still in question, and over which an appeal was still pending*. Finally, we now know from the *Overton Park* case that courts should not shrink from halting construction of projects such as the North Expressway which are being erected in clear violation of the law.

view, the district court shall conduct a full review of the case as soon as possible in accordance with the guidelines laid down here and in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Construction shall not proceed until there has been full compliance with the law.

Reversed and remanded with directions.

CLARK, Circuit Judge (concurring in part and dissenting in part).

I completely concur with all of the majority opinion save Part VII, and with the grant of injunctive relief against the federal defendants pending their full compliance with federal law. With deference, however, I dissent from so much of the opinion as holds that we can or should compel the State of Texas to hazard damages or possibly to forfeit the millions of dollars of her taxpayers' money now invested in the construction work which has been accomplished on the two end "segments" and in the parcels of right-of-way bought and paid for over the length of the entire project. See the cases cited in footnote 4 to the majority opinion. I do not say we should condone any form of subterfuge. However, no federal funds have yet been received for or expended on this project and should the State of Texas unqualifiedly renounce any federal fund participation in this project in the future, I cannot conceive of any equitable basis upon which the court below could enjoin the completion of this work as a purely State action. Texas is fortunate to have a tax base large enough to permit her to qualify for all permissible federal fund highway assistance each fiscal year. Thus, I do not see the withdrawal of her unaccepted application for federal funding of this project as any sort of an illicit or improper diversion of funds to thwart national policy. If Texas makes a final disengagement from what appears to me more nearly a proposal than a marriage, then neither Section 4(f) of the Department of Transportation Act of 1966 or the National Environmental Policy Act of 1969 would govern the execution of the remaining construction.

The plaintiffs have suggested that Texas would still be bound by its own law—Tex.Rev.Civ.Stat.Ann. art. 5421q (Supp.1971), an almost literal embodiment of Section 4(f)—and that the court below would have pendent jurisdiction to enforce this State statute. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). There has been no development of this jurisdictional issue in that court. But assuming that the district court would have power to adjudicate this claim on such a jurisdictional basis, I believe it should exercise its discretion not to proceed on this wholly State cause of action and thus avoid a needless decision of State law. See C. Wright, Law of Federal Courts, 62–65 (2d ed. 1970). The mere fact that State law parallels federal law, without more, is no reason to warrant a federal forum in adjudicating a contention that a State may be violating its own statute. Such litigation ought to be strictly the business of State courts.

To this extent and on the condition set out, I respectfully dissent as to this point.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

CLARK, Circuit Judge (concurring in part and dissenting in part).

For the reasons set forth in my partial dissent, I also respectfully dissent from the Court's refusal to grant a rehearing as to Part VII of the majority opinion.