CITIZENS EXPRESSWAY COALITION, INC., Bess Woods, Jerry and Anita Thomas, Roy Rogers, Kenneth and Floys Kenner, Paul M. Ferris and Mario E. Costaley, Plaintiffs,

v.

Drew LEWIS, Secretary of Transportation; Daniel Dake, as an Employee of the Federal Highway Administration; and Henry Gray, as Director of the Arkansas State Highway and Transportation Department, Defendants.

OZARK TRANSPORTATION COUNCIL, INC.; Robert A. Jordan and Barbara Dillon Jordan; Richard L. Hoyt and Violet M. Hoyt, Plaintiffs,

v.

Henry GRAY, Individually and as Director of the Arkansas State Highway and Transportation Department; Roger Borg, Individually and as Employee of the Federal Highway Administration; and Drew Lewis, Individually and as Secretary of the United States Department of Transportation, Defendants.

Nos. LR–C–81–124, LR–C–81–586.

United States District Court,
E. D. Arkansas, W. D.

Sept. 30, 1981.

Larry S. Froelich, Fayetteville, Ark., R. Douglas Schrantz, Rogers, Ark., Kevin J. Pawlik, Bentonville, Ark., David S. Herdlinger, Springdale, Ark., James R. Jackson, Fayetteville, Ark., for plaintiffs.

Thomas B. Keys, Christopher O. Parker, Little Rock, Ark., for Arkansas State Highway Dept.

Robert L. Neighbors, Asst. U. S. Atty., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

WOODS, District Judge.

### INTRODUCTION

This action involves the construction of 25.3 miles of highway running from Bella

Vista to the Fayetteville Loop. Highway 71 is completed from Bella Vista to the Missouri line, and the proposed construction will link Bella Vista and the Fayetteville bypass. This connection will bypass the developing urban areas of Springdale, Rogers and Bentonville. Its purpose is to relieve the admittedly serious traffic congestion in these areas. There are no plans at this time to continue the highway south of Fayetteville, thereby connecting Fayetteville and Fort Smith. As required by law, a final environmental impact statement covering this project was filed before final approval of the project. It is the sufficiency of this impact statement which is being questioned in these lawsuits.

The plaintiffs first challenge the scope of the EIS, contending that the Fayetteville-McKissick Creek segment of the construction is part of the larger project of highway construction running from the Missouri line to Fort Smith. In support of this argument, the plaintiffs' expert suggested that some study should be made of the impact on the highway area immediately south of Fayetteville. On the other hand, the defendants argue that the Fayetteville-McKissick Creek project has utility independent of any improvements that might be made south of Fayetteville. At this time there are no plans to improve this section of the highway.

The plaintiffs also attack the EIS for failing to adequately consider the alternative of improving existing Highway 71. Considerable time was devoted to this argument by the plaintiffs' expert. In substance Mr. Lazar claimed that a detailed study of the feasibility of adding lanes to Highway 71 should have been undertaken. While the EIS does contain a study of this alternative, it also contains the conclusions that such an addition would not relieve congestion and would be prohibitively expensive.

Additionally, the EIS section on archeological sites is criticized by the plaintiffs. While the testimony of the State archeologist highlighted certain deficiencies, she did state that her belief that the handling of archeological finds was an ongoing process and any problems would undoubtedly be worked out to the satisfaction of her department.

After finding fault with the EIS for failing to consider alternatives, the plaintiffs' expert suggested that the impact statement should have included the final design details. Instead the defendants' exhibits reveal that Arkansas has adopted a two-step approach to presenting the public with proposed construction plans. This approach provides for design public hearing after the location of the highway has been approved.

Finally the plaintiffs take issue with the role of the Federal Government as it relates to the EIS. It is claimed that the Federal Government did not conduct an independent study and review of the State's plan. Records of meetings between the State and Federal Government and the testimony of the State Director of the FHWA were introduced by the defendants to refute the plaintiffs' allegations.

The Environmental Impact Statement, which is the only issue in this case, is required by the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq. In summary, this act sets forth the following:

[t]here must be included in every federal recommendation for major federal action significantly affecting the quality of the human environment a detailed written statement dealing with (1) the environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the relationship between the local short-term use of the environment and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented. (*Farmland Preservation Ass'n v. Goldschmidt*, 611 F.2d 233, 236 (8th Cir. 1979).)

## FINDINGS OF FACT

1. The construction of the bypass has been realigned so that it will avoid archeo-

logical sites 3WA 262 and 3BE 270 and will have no effect on these sites, which have been identified as potentially significant sites. Ten other sites identified as potential archeological locations are not in the path of the right-of-way, except for two possible sites near the proposed right-of-way. Both the defendants and State archeologist have stated that the discovery and mitigation of archeological sites is an ongoing process and that problems connected with such sites are handled or mitigated as they arise. We find that the State and Federal authorities have adequately explored and taken into consideration the possible disturbance of the area's archeological resources.

2. The State archeologist criticised the EIS on the ground that it did not specifically require the contractor to cease work in progress pending proper evaluation, in the event that archeological evidence was unearthed. This requirement is covered by a Federal regulation and is part of the standard bid specifications for the project. When the State archeologist was apprised of the bid specification on cross-examination, she withdrew this objection to the EIS. We therefore find this objection to be without any basis.

3. We further find on the basis of the candid testimony by the State archeologist that a good relationship exists between her and the Highway Department archeologist and that this relationship will continue to the end that no significant archeological sites will be endangered by the work on this bypass.

4. The alignment was changed to avoid destruction of Johnson's Mill, a very significant historical site. From her testimony it was apparent that the State archeologist did not clearly understand that this route change had been made, but she has now been satisfied, and the Court finds that this historic mill dating from 1867 will not be disturbed.

5. We find the EIS gave adequate consideration to the alternative of upgrading the existing roadway of Highway 71 between the present Fayetteville bypass and Bella Vista. The plaintiffs contend that the study of this alternative should have been pursued in greater depth. We find that pursuit in greater depth was completely unjustified. The EIS shows 500 businesses along this route, with which the Court is very familiar. The Court takes judicial knowledge that there is almost complete business development along both sides of Highway 71 in its present location, which traverses the center of three large and rapidly growing northwest Arkansas cities—Springdale, Rogers and Bentonville. Not only would a multitude of large and highly successful businesses be affected by the widening of the present highway or its conversion to an expressway, but some of the largest manufacturing plants in the State of Arkansas would also be seriously affected. We find it obvious, as did the EIS, that upgrading the present location of Highway 71 is not feasible from an economic standpoint.

6. In addition to the considerations mentioned above in Finding No. 5, we find that upgrading the present route of 71 would not alleviate either the present or projected travel flow on this route, which consists of a substantial amount of truck traffic moving along heavily developed business and manufacturing property.

7. Job 1445 is approximately 25.3 miles. This is a project of sufficient length to permit consideration of environmental matters on a broad scope with a meaningful evaluation of alternatives.

8. The north terminus of Job 1445 will be a recently completed section of Highway 71 through Bella Vista, Arkansas, to the Missouri line. The south end of Job 1445 is the north end of the existing Fayetteville Loop. These are logical termini.

9. Job 1445 will have an independent utility regardless of whether any improvement of Highway 71 is undertaken between Alma, Arkansas and the south end of the Fayetteville Loop.

10. Job 1445 connecting into the north end of the existing Fayetteville Loop and any future improvement to Highway 71 connecting into the south end of the exist-

ing Fayetteville Loop will not be physically contiguous. The construction of Job 1445 will not limit the choice of any corridor south.

11. The Final Environmental Impact Statement, Job 1445, for a 25-mile relocated section of Highway 71 from the north terminus of the Fayetteville Loop to McKissick Creek does not artificially segment some other highway project.

12. The Final Environmental Impact Statement for Job 1445 was critically and thoroughly analyzed by Federal Highway Administration officials who took an active part in its preparation.

13. Federal Highway Administration officials conducted an adequate independent review of the environmental impact of Job 1445.

14. The Environmental Impact Statement adequately discusses all reasonably feasible alternatives. The document contains sufficient information to permit a reasoned choice among the alternatives.

## CONCLUSIONS OF LAW

### A. Segmentation

■ The plaintiffs in this case contend that Job 1445 is a segment of a larger project and that an impact statement on the entire project should be required. The Eighth Circuit reviewed a similar argument in *Indian Lookout Alliance v. Volpe*, 484 F.2d 11 (8th Cir. 1973). There the court summarized the law as follows:

> The nature of the proposal will bear on the determination of the appropriate length to be covered, as the length ". . . obviously need not be so extended that consideration of alternatives overlooks a major objective of building the proposed highway." *Committee to Stop Route 7 v. Volpe*, 346 F.Supp. 731, 740 (D.Conn. 1972)). If the major objective of a proposal is to connect two cities by expressway, then these two termini should determine the proper scope of the EIS.

.  .  .  .  .

However, in order to comply with the spirit and objectives of NEPA to safeguard natural resources while effectively applying the arts and the sciences in utilizing our natural resources and to cause a meaningful consideration of environmental effects along with a consideration of alternatives, the minimum length of state highway projects that are supported in part by federal funds must be extended to embrace projects of a nature and length that are supportable by logical termini at each end. A single project, such as the San Antonio Freeway route from the airport to downtown in *Named Individual Members of San Antonio Conservation Society*, 446 F.2d 1013 (5th Cir. 1971) could not have been broken into segments at all for the purposes of NEPA. Segments that fit into an overall highway plan should be as large as is feasible under present construction and financing practices and at least be independently supportable by meaningful terminal points. However, an impact statement can be more extensive than the proposed project. At 18–19.

The segment of highway in issue in this case is approximately 25.3 miles long. Both the testimony at trial and the Environmental Impact Statement reveal that this section of highway runs between logical termini. The northern terminus is the completed section of Highway 71 running through Bella Vista, and the southern terminus is the existing Fayetteville Loop. Furthermore, this section has a utility independent of any improvement that might be made to Highway 71 south of Fayetteville. Clearly, this section will carry traffic from one well defined point to another, and it is appropriate that this section be covered by an independent environmental impact statement.

### B. Alternatives

■ The plaintiffs also suggest that the Environmental Impact Statement is deficient in that it fails to adequately consider alternatives to the proposed project. The standards by which the sufficiency of alternative projects is to be judged is contained

in *Minnesota Public Interest Research Group v. Butz*, 541 F.2d 1292 (8th Cir. 1976). There the court stated:

> We have held that the test of compliance with the procedural provisions of § 102(2)(C) is one of good faith objectivity.... The touchstone of our inquiry is reason.... While the detailed statement must of course be more than *pro forma* ritual, *EDF v. Froehlke*, [368 F.Supp. 231] *curiam sub nom. EDF v. Callaway*, 497 F.2d 1340 (8th Cir. 1974), the discussion of environmental effects and alternative courses of action need not be exhaustive....
>
> > [NEPA] must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the Nation's needs are not infinite.
>
> > ... Thus, the EIS need contain only sufficient information to permit a reasoned choice of alternatives. *Id.; NRDC v. Morton*, 458 F.2d [827] at 837. The purpose of NEPA is not to require an objection free document, but rather to give Congress, the responsible agencies, and the public a useful decision-making tool. At 1300.

This section on alternates appearing in the EIS covers two courses of action. The first of these is alternate B which sets forth a different route than that finally adopted. Since the plaintiffs are not suggesting that this route is preferable to alternate A, we need not discuss it except to note that it is sufficiently developed and rejection sufficiently well reasoned to satisfy the requirements of NEPA. The second alternative considered is denominated the "Do-nothing Alternate." This alternative was also adequately discussed and justifiably rejected. Under Section D other alternatives are described, one of which is "Upgrading Existing Facilities." It is this alternative which the plaintiffs claim is deserving of further study. In this section it is stated on p. IV–5:

> Upon recognizing the need for a highway improvement in the area, a logical approach would be to review the possibility of improving existing U. S. 71 or other traffic arteries in the area.
>
> Over the past four to five years, the existing road has been widened from two to four and five lanes with median at some locations. Expansion to four and five lanes is programmed for the remaining two-lane segments of existing U. S. 71 between Bella Vista and Rogers; but, even with these improvements U. S. 71 will be inadequate to accommodate the increasing traffic demands (see Section I–A).
>
> U. S. 71 presently sustains intensive commercial development along much of its length between Fayetteville and Bella Vista, particularly in the Fayetteville/Springdale/Rogers area. Any further widening of this segment would necessitate the relocation of most of the businesses abutting U. S. 71.
>
> Upgrading U. S. 71 between Fayetteville to Bella Vista to a six-lane expressway would require the relocation of approximately 500 businesses, depicted in Table 4–1. A relocation program of this magnitude would be, of course, prohibitively expensive.

On the basis of this statement and the discussion which follows, we must conclude that the upgrading of existing facilities was considered in sufficient depth to provide the decision maker with a "reasoned choice of alternatives." We also find that the discussion and rejection of this alternative was neither unreasonable nor arbitrary. *Farmland Preservation Ass'n. v. Goldschmidt*, 611 F.2d 233 (8th Cir. 1979). Undoubtedly, the relocation of businesses abutting U. S. 71 would be prohibitively expensive, and would not solve the traffic problems that exist in the area.

The EIS also considers the development of mass transportation. With regard to this alternative, it is stated in the EIS at p. IV–10:

> Travel patterns in Northwest Arkansas are such that this transit need does not

occur. There are no predominate common points and travel desires are distributed over a great period of time, partially a result of the University System and recreational influence. It is also significant to note that any form of mass transit does not satisfy distribution requirements for goods and services.

This conclusion is supported by testimony at trial. This section of the EIS reveals the alternative of mass transportation was adequately explored.

In reviewing the alternatives section in its entirety, we find that alternatives were reasonably selected and were developed in sufficient depth to satisfy the requirements of NEPA.

C. Archeological Sites

■ The EIS section on archeological impacts identifies twelve sites within the area of the proposed plan. It is noted that of these twelve sites only two will be close to actual construction. Should either of these sites be affected or should sites at the northern terminus be disturbed, it is stated that agreements with the Arkansas Archeological Survey will be entered into and that mitigation plans will be developed.

Both the defendant and State archeologists have stated that the discovery and mitigation of archeological sites is an ongoing process and that problems connected with such sites are handled or mitigated as they arise. The State archeologist also testified that she had worked successfully with the State in the past and that she anticipated that the State would continue to follow Federal guidelines and regulations as they apply to this construction.

Given this explanation and the statements contained in the EIS, we find that the defendant's method of dealing with archeological impacts is reasonable and that discussion of those plans, supplemented by the defendant's exhibits is sufficient for purposes of the EIS.

D. Design Hearings

■ The plaintiffs' expert testified at length that the final EIS was inadequate for failing to set forth detailed design proposals. The procedure in this state for public participation is outlined in the Arkansas Action Plan. That plan calls for location study report which includes a series of public hearings and the development of alternatives. After the location of the highway is discussed and approved, Design Public Hearings are held at which the details of the project are presented to the public. Aerial mosaics are made available at these hearings, and property owners, streets and topographical features are labeled. This procedure, of course, enables individual property owners to see exactly how their land will be affected and to express their views concerning the preliminary design. It is the position of the plaintiffs that these detailed designs should have been submitted to the public in the final EIS. We disagree with this argument. The Arkansas Action Plan was approved by the Federal Highway Administration, and we believe that the flexibility of this approach allows for more than adequate public participation in the project and insures responsiveness on the part of the State. We therefore hold that the EIS is sufficient, although it fails to detail the minute design of the proposed construction.

E. Federal Participation

■ Finally, the plaintiffs claim that the Federal Highway Administration did not conduct an independent review of the project's impacts. The exhibits and testimony reveal that numerous meetings were held between the State and Federal agencies and that the FHWA made suggestions and independent investigations. Given this extensive participation by the Federal government, we feel that its role in the approval of the final EIS was adequate.

Since the plaintiffs have failed to show that they will suffer irreparable harm or that there is a likelihood of success on the merits, their motion for a permanent injunction is denied. For the reasons set forth in this opinion, the plaintiffs' motion for summary judgment is also denied, and judgment is rendered for the defendants.