STOP H–3 ASSOCIATION a Hawaiian non-profit corporation, et al., Plaintiffs,

v.

Claude S. BRINEGAR, Individually and as Secretary of the United States Department of Transportation, et al., Defendants.

Hui Malama Aina O KO'OLAU et al., Plaintiffs,

v.

Claude BRINEGAR, Individually and as Secretary of Transportation, et al., Defendants.

Civ. Nos. 72–3606, 73–3794.

United States District Court, D. Hawaii.

Dec. 26, 1974.

Boyce R. Brown Jr., Mattoch, Kemper & Brown, William S. Hunt, Hart, Leavitt & Hall, Honolulu, Hawaii, for Stop H–3 Association, and others.

Robert Gilbert Johnston, Durell Douthit, Honolulu, Hawaii, for Hui Malama Aina O Ko'Olau, and others.

Warren H. Higa, Asst. U. S. Atty., Harold M. Fong, U. S. Atty., Honolulu, Hawaii, Mel Nishimoto, Johnson H. Wong, Deputy Attys. Gen., Ronald Amemiya, Atty. Gen., State of Hawaii, Honolulu, Hawaii, George W. Playdon, Jr., Sp. Deputy Atty. Gen., Honolulu, Hawaii, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAMUEL P. KING, Chief Judge.

### STATEMENT OF THE CASE

This case involves the construction of (T)H–3, a defense interstate highway on the island of Oahu, State of Hawaii.

The original complaint in Civil No. 72–3606 was filed on July 19, 1972. After several amendments, a consolidated complaint entitled Compilation of Complaint for Injunctive and Declaratory Relief, as Amended and Supplemented, was filed and received in evidence on December 3, 1974, as Court's Exhibit 2. Consolidated answers were filed by the federal defendants on December 3, 1974,

and by the state defendants on December 4, 1974. The consolidated complaint set forth seven causes of action. On December 10, 1974, the complaint was amended to add an eighth cause of action. This was duly answered by the state defendants on December 18, 1974, and by the federal defendants on December 23, 1974.

A separate complaint, Civil No. 73–3794, was filed on April 9, 1973, by additional plaintiffs against the same defendants with relation to the same highway. Inasmuch as this complaint included issues not raised in Civil No. 72–3606, an earlier attempt on March 16, 1973, to intervene, was denied, and the two actions were not at first consolidated. By stipulation entered December 3, 1974, the plaintiffs in Civil No. 73–3794 agreed to a dismissal of certain of their claims, rendering the issues in both actions identical, and the two suits were consolidated for trial on the merits. Answers to this complaint were duly filed by the state defendants on May 1, 1973, and by the federal defendants on June 7, 1973.

At the time of the filing of the complaint in Civil No. 72–3606, one of the issues raised was that the defendants had failed to comply with Section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. § 4332(2)(C)). The Secretary of Transportation took the same position. He had instructed the state authorities to provide additional information. Thus there was no approved environmental impact statement upon which to base the processing of federal-aid funds for this highway. On the other hand, two segments of the highway were already under construction, and the defendants took the position that, in applying NEPA to this project, further construction on these two segments should not be enjoined.

There being something to be said on both sides, the parties sensibly reached an agreement which was filed on September 15, 1972, in the form of a stipulation approved and ordered by the court. The stipulation permitted continued construction of the Halawa Interchange and that segment of the highway extending from (but not including) the Halekou Interchange to the Kaneohe Marine Corps Air Station, and enjoined all other construction, further acquisition of right of way, and further letting of contracts on the rest of the highway, which was identified as the Moanalua-Haiku Segment. After approval of an EIS, the adequacy of the EIS and all other issues still unresolved would be litigated.

On September 22, 1972, defendants moved for an order requiring plaintiffs to furnish security in the amount of $337,300 or such other amount as the court should deem proper. A bond of $100 was ordered.

Defendants then sought a "clarification" of the stipulation to permit the completion of test borings and the continuation of design work, both with respect to the Moanalua-Haiku Segment. Test borings which had been physically begun were allowed to be completed, but the expenditure of funds for further test borings or design work was specifically enjoined by decision and order entered October 18, 1972. Stop H–3 Association v. Volpe, 349 F.Supp. 1047 (D. Hawaii 1972).

These issues were reargued on defendants' application filed on October 24, 1972, for stay of the injunction pending appeal. The motion for a stay was denied on December 18, 1972. Stop H–3 Association v. Volpe, 353 F.Supp. 14 (D.Hawaii 1972).

On December 11, 1972, defendants moved for an amendment to allow further test borings under an existing contract. On December 19, 1972, the motion was denied.

On March 1, 1973, plaintiffs filed a motion for partial summary judgment compelling new hearings pursuant to 23 U.S.C. § 128. On May 3, 1973, plaintiffs filed a motion for partial summary judgment ordering the "Preface" to the EIS to be circulated for comment. On

July 6, 1973, the court entered findings of fact, conclusions of law, and an order requiring the so-called preface to be circulated and reviewed in accordance with the provisions of FHWA PPM 90–1, paragraph 6, and of Section 102(2)(C) of NEPA. On July 13, 1973, the court entered statement of facts, conclusions of law, and an order requiring new public hearings complying with 23 U.S.C. § 128(a) and (b), as amended in 1968 and in 1970, with FHWA PPM 20–8, and with 23 C.F.R. § 790, as amended through May 9, 1973.

On April 22, 1974, defendants filed a motion for an "interpretation" of the stipulation and injunction of September 15, 1972, to exclude from the terms of the injunction certain portions of the highway segment between the Kaneohe Marine Corps Air Station and the Halekou Interchange. It was clear that the defendants sought not an "interpretation" but an amendment. The motion was denied on May 8, 1974.

During these past two years, considerable activity was taking place. New section 128 hearings were held. The preface, and certain appendices resulting from the hearings, were circulated for review. The construction of the highway became a political issue in the 1974 gubernatorial campaign. The valley through which the highway was to be built was considered for inclusion in the National Register of Historic Sites and other aspects of 23 U.S.C. § 138 (49 U.S.C. § 1653(f)) and of 16 U.S.C. § 470, were explored.

Finally on October 29, 1974, defendants filed a motion for an order dissolving the existing injunction on the ground that all requirements preliminary to the federal action contemplated had been met. On November 15, 1974, the court granted defendants' motion for a trial on the merits as to all causes of action in Civil No. 72–3606, to commence December 3, 1974. As noted earlier, Civil No. 73–3794 was later consolidated with Civil No. 72–3606 for trial on the merits. In pretrial it was agreed that defendants would proceed first to put on their evidence showing compliance with all statutes, regulations, orders, policies and procedures referred to by plaintiffs in their complaints; that plaintiffs would then put on their evidence as to noncompliance or faulty compliance; and that either side would then put on whatever rebuttal and sur-rebuttal was appropriate, all without altering the burden of persuasion. Trial on the merits was held as scheduled, and the matter is now before me for decision.

ISSUES

Plaintiffs' consolidated complaint as amended in 72–3606 contains eight causes of action. Plaintiffs' complaint in 73–3794 raises essentially the same issues as are raised in the first, third, and fourth causes of action in 72–3606, with special emphasis on the social and economic effects of the project on the residents of Kahaluu. These causes of action assert claims as follows:

(A) Non-compliance with NEPA.

(B) Non-compliance with 23 U.S.C. § 128 and PPM 20–8, relating to public hearings.

(C) Non-compliance with 23 U.S.C. § 134, relating to the continuing comprehensive cooperative process for transportation planning in urban areas.

(D) Non-compliance with those provisions of the Charter of the City and County of Honolulu relating to the general plan.

(E) Non-compliance with 49 U.S.C. § 1653(f) and 23 U.S.C. § 138, relating to preservation of parklands.

(F) Non-compliance with 23 U.S.C. § 109(a) and (j), relating to air quality.

(G) Non-compliance with the National Historic Preservation Act.

(H) Non-compliance with DOT I.M. 50–3–71, relating to urban transportation planning as it affects project approval.

The original complaint having been filed in July 1972, and the case being

submitted on the merits in December 1974, certain intervening events have rendered some of these causes of action moot at this time. Plaintiffs acknowledged this state of the record upon competition of the trial by withdrawing their second cause of action relating to public hearings pursuant to 23 U.S.C. § 128 and PPM 20–8, the second alternative claim to their third cause of action relating to transportation planning, and their sixth cause of action relating to air quality.

A. NEPA

Plaintiffs argue that defendants failed to comply with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4347, in eight specific particulars as follows:

1. The EIS fails to discuss adequately the need for the highway.

2. The EIS fails to reflect FHWA compliance with the National Historic Preservation Act of 1966.

3. The EIS fails to describe adequately the impact of the project on historical resources.

4. The EIS fails to adopt the findings of various federal agencies who have expertise in determining the impact of the project.

5. The EIS fails to describe adequately the secondary effects of the project.

6. The EIS fails to describe adequately the measures to be taken to mitigate the adverse effects of the project.

7. The EIS fails to reflect, and defendants failed to engage in, any meaningful cost-benefit analysis of the project and the reasonable alternatives thereto.

8. The EIS fails to discuss adequately reasonable alternatives to the project.

A.1. The adequacy of the EIS discussion as to the need for the highway.

PPM 90–1, Appendix E, paragraph 2a, sets out as a minimum the matters to be covered in an EIS with respect to a "description of the proposed highway improvement and its surroundings." Among the matters catalogued is "the need for the proposal".

PPM 90–1 is not any more explicit as to what constitutes a minimum discussion of "the need for the proposal". Plaintiffs argue that the EIS only presents a justification for an assumed need by uncritically accepting a high figure as to the number of persons to be moved across the Koolau Mountains in the peak direction during the peak hour of use (12,760 persons), a low factor of those who would use mass transit facilities (21.9%), a low per car occupancy (1.2 persons), and a low lane capacity (1200 vehicles per hour), all of which are open to serious questions, none of which have been discussed in the EIS. Plaintiffs point to CEQ Guidelines 40 C.F.R. 1500.8(a)(4) relating to the type of analysis required concerning alternative proposals as suggesting as a minimum the same kind of analysis with respect to the proposal itself. They suggest that two pages in the EIS, Volume I pp. 12–13, are inadequate to cover this subject.

Defendants argue that the figures used in determining the need for the additional lanes of traffic were not assumptions without foundation, but were taken from the Oahu Transportation Study. They also object to the issue as being raised for the first time in final argument.

■■ I find that the issue is fairly before the court for decision. I find that the discussion of "the need for the proposal" meets the requirements of CEQ Guidelines, PPM 90–1, and NEPA.

Aside from the discussion at EIS Volume I pp. 12–13, there are other portions of the EIS addressed to this matter. Alternative computations are discussed in EIS Preface pp. 3–4 (Impact on Trans-Koolau Transit Utilization), pp. 7–8 (Land Use), Exhibit 5 (Interstate Route H-3 and Land Use on Windward Oahu), and in EIS Appendix B pp.

43–48 (Transportation and Traffic Flow), 59–63 (The Transportation Problem), pp. 31–33 (Land Use), and pp. 64–69 (Land Use Planning and Oahu General Plan). There are other portions of the EIS that relate to this issue, as, for example, the Oahu General Plan itself, which is contained in a pocket part of EIS Preface.

A.2. EIS reflection of FHWA compliance with the National Historic Preservation Act of 1966.

PPM 90–1, Appendix E, paragraph 3e provides that "when National Register Properties are involved", evidence that the provisions of 16 U.S.C. § 470f (Section 106 of the Historic Preservation Act of 1966), have been satisfied, "should be included" in the EIS, "when pertinent and available", "to the extent practicable".

PPM 90–1, paragraph 5d, suggests that the provisions of 16 U.S.C. § 470f "should be satisfied" before submitting the final EIS to the FHWA.

CEQ Guidelines 40 C.F.R. 1500.9(a) suggests that "to the extent possible", statements or findings concerning environmental impact required by other statutes, such as 49 U.S.C. § 1653(f) or section 106 of the National Historic Preservation Act of 1966, should be combined with the EIS prepared pursuant to NEPA, "to yield a single document which meets all applicable requirements."

DOT Order 5610.1A, paragraph 9, contemplates that the NEPA EIS shall be prepared in such a manner as to meet the statement requirements of, among other statutes, section 4(f) of the DOT Act, and section 106 of the Historic Preservation Act.

Regulations promulgated by the Advisory Council on Historic Preservation, 36 C.F.R. Part 800, require early identification and protection of properties that are included in or eligible for inclusion in the National Register of Historic Places and a draft environmental statement prepared in compliance with NEPA. *See* especially 36 C.F.R. 800.-4(a) and 800.6(e)(2).

Plaintiffs argue that the EIS is woefully deficient in respect to this type of information in relation to several sites and objects entitled to protection. These are:

(a) Pohaku ka Luahine—which was placed on the National Register of Historic Places on July 26, 1973.

(b) Moanalua Valley—which was determined to be likely to be eligible for listing on the National Register of Historic Places on March 29, 1974, the determination having been published on May 8, 1974 (39 Fed.Reg. 16176).

(c) Properties possessing historical, architectural, archeological, or cultural value located within the area of the undertaking's potential environmental impact.

One of the difficulties in applying new law to old projects is that steps that would now be taken early in the process must be superimposed on a process that has gone on for several years. The H-3 project dates from about 1964–1965. The first 6 volumes of what was then called a final EIS were submitted to the FHWA by the State on August 2, 1972. These volumes were followed by a Preface and two Appendices, the former submitted March 15, 1973, and the latter submitted December 26, 1973. EIS Volume I pp. 24–34 and 63–68 discuss petroglyph rocks (of which Pohaku ka Luahine is one), other archeological sites in Moanalua Valley, Bishop Museum archeological studies which appear as EIS Volume IV Appendix 4(e), and agreements contemplated between the State and the owners of Moanalua Valley to minimize the impact of the highway on the archeological sites and valley itself.

The EIS Preface pp. 2, 8–9, and Exhibit 6, set out at some length discussions and proposed agreements between the State and the Damon Estate regarding Pohaku ka Luahine and Moanalua Valley. EIS Appendix A, pp. 183–368 contains extensive material regarding the historic importance of Moanalua

Valley. EIS Appendix B, pp. 34–42, 97–102, and Attachment III, discuss Moanalua Valley and Pohaku ka Luahine.

■■ I find that the discussions in the EIS of the impact of the highway on properties possessing historical, architectural, archeological, or cultural value located within the area of the undertaking's potential environmental impact, especially with respect to the petroglyph rock Pohaku ka Luahine and to Moanalua Valley, were adequate when submitted both for purposes of NEPA and for purposes of a 4(f) statement. The fact that the 4(f) requirements may not have been satisfied before the final EIS was submitted to the FHWA on December 26, 1973, or that additional information may now be required for an adequate 4(f) statement, does not require that the entire EIS be recalled, revoked, and resubmitted. The major considerations and disputes surrounding the preservation of historic sites that might be affected by this project were clearly expounded and brought to the attention of the responsible state and federal decision-making officials.

Furthermore, the responsible government officials had good reason to believe in December 1973 that agreements had been reached regarding the protection of Pohaku ka Luahine and the minimization of adverse effects on Moanalua Valley.

Plaintiffs suggest that there are numerous other historic sites, particularly on Windward Oahu, that should have been discussed in the EIS. No one came forward with a serious contention that any other such site would be affected by the highway.

A.3. The adequacy of the EIS discussion of the impact of the project on historical resources.

■ A reading of sections 102(2)(C)(i) and (ii) of NEPA, PPM 90–1 Appendix E, CEQ Guidelines 40 C. F.R. 1500, et. seq., and DOT Order 5610.1A, does lead to the conclusion that an EIS which is developed from scratch as of today should describe the significant impacts of the project on historic sites, landmarks, cultural or scenic resources of national, state, or local significance, and any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge.

Plaintiffs reargue in this regard the insufficiency of the EIS (i) in failing to identify Moanalua Valley as a site protected by 16 U.S.C. § 470f, (ii) in failing to identify the adverse effects of the project on Pohaku ka Luahine, (iii) in failing to identify various historically significant sites in Halawa Valley and Moanalua Valley, (iv) in failing to discuss the effect of the project on historical resources located on Windward Oahu, and (v) in failing to include any discussion of the proposed taking of 4.09 acres of the Pali Golf Course.

For the reasons set out above under A.2, I find that the discussion in the EIS is adequate compliance with the referenced statutes, regulations, orders, policy memoranda, and guidelines.

■ While it is true that the taking of the Pali Golf Course property is not discussed in what has been identified as the EIS, a separate Report on the Pali Golf Course was submitted to FHWA by the state on October 5, 1971. It would seem that in this instance the state was following good practice in attempting to satisfy 4(f) requirements before submitting the final EIS.

In any event, plaintiffs do not contend that the responsible state and federal decision-makers were not aware of the Report on the Pali Golf Course, or that the report was not circulated and reviewed by the proper officials. They do contend that the report should have been incorporated in, and circulated at the same time as, the submission labeled "Final Environmental Statement". This is exalting form over substance.

An examination of the actual area taken shows that the land in question is not part of the golf course playing area. This may account for the fact that no

witness has complained about this taking, and that plaintiffs did not attack the adequacy of the report as a 4(f) statement.

A.4. Adoption of findings of various federal agencies having expertise in certain areas.

Section 102(2)(C) of NEPA requires that the responsible federal official shall consult with and obtain the comments of any federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a contemplated major federal action significantly affecting the quality of the human environment. Statements, comments and views of such officials are required to be circulated with the proposal for action through the existing agency review process. The views of such agencies must be given careful consideration and cannot be ignored or overridden without what amounts to a showing of good cause.

■ Plaintiffs contend that defendants failed to defer to a CEQ statement that the EIS was inadequate in certain respects, and failed to defer to EPA criticisms of the air pollution studies, the assertion that the highway will not affect development rates on Windward Oahu, and the assessment of the impact on Kaneohe Bay.

Much was made of the competing and allegedly contradictory air pollution studies by different experts. Without reviewing all of this evidence, the fact is that defendants did not ignore EPA's criticisms but spent considerable time and money checking and rechecking their results. The final result cannot be said to be that EPA has been overridden in any event, as the EPA letter only called for more information which was supplied. I am not aware that EPA thereater disapproved the EIS's discussion of air quality.

Similarly, with respect to the other comments by CEQ and EPA, defendants responded with specific replies. As these bodies raised questions rather than stated facts, there is no direct contravention of their expertise.

A.5. The adequacy of the EIS discussion as to the secondary effects of the project.

NEPA, CEQ Guidelines 40 C.F.R. 1500.8(a)(3)(ii) and PPM 90-1, Appendix E, paragraph 2.b.(1), require a discussion in the EIS of the secondary or indirect consequences for the environment of the project. Examples of matters to look for are given, such as associated investments, changed patterns of social and economic activities, and changes in population patterns or growth, and their effects upon the resource base, land use, water, and public services.

■ Plaintiffs fault defendants in this regard for not conducting an adequate research program of all possible potential secondary impacts suggested by existing knowledge, not considering the secondary impacts outside of "Census Track 103", and inadequately discussing the secondary impacts within "Census Track 103".

An in-depth socio-economic study was conducted by the state on the Heeia-Kahaluu Kualoa area. This study is included in EIS Appendix B as Attachment IV. Socio-economic effects in general are discussed in EIS Volume I pp. 55–58. Population growth and distribution is discussed in EIS Preface Exhibit 5 pp. 1–12. Further socio-economic considerations are discussed in EIS Appendix A and Appendix B. Reviewing this discussion, I find that it is an adequate statement of the secondary or indirect consequences of the project as required by applicable statutes, regulations, and guidelines.

A.6. The adequacy of the EIS description of mitigating measures to be taken.

■ NEPA implies a requirement that action be taken to mitigate the adverse effects of major federal actions.

Plaintiffs argue that the EIS is deficient in this area because it does not ad-

equately discuss the adverse effects of the highway (especially the socio-economic effects), and to the extent that it does discuss such effects, the individuals affected were not consulted and the federal, state, and local agencies best equipped to suggest ways to minimize harm were never asked to do so.

 Assuming there is more to this requirement than the procedural steps detailed in NEPA and supporting directives, the short answer is that plaintiffs' contention is simply not correct. The review process itself is a request to concerned agencies for comments and suggestions. Extensive public hearings were held at which those affected could be heard. Written comments from anyone were solicited. Specific steps to be taken to mitigate specific adverse effects are discussed in the EIS, as for example with respect to noise at EIS Preface pp. 4–7.

There is no such failure of the EIS to discuss mitigation of adverse effects as to render the EIS inadequate.

A.7. Cost-benefit analysis of the project and of the reasonable alternatives thereto.

NEPA and supporting directives require that methods and procedures be developed which will insure that unquantified environmental amenities and values may be given appropriate consideration in decision making. Case law explains this requirement in terms of a balancing judgment to be made by the responsible decision-making officials whereby the particular economic and technical benefits of planned action are assessed and weighed against the environmental costs in order to ensure that the optionally beneficial (minimally adverse) action is finally taken. This evaluation is discussed today in terms of cost-benefit analysis. Combined with the requirement that alternatives to the proposed action (including no action) must be set out in detail in an EIS, the developed state of the art would suggest a cost-benefit analysis for each alternative which would imply a study of each

alternative to the same depth as the main proposal.

Plaintiffs assert that the EIS is inadequate because it does not contain any such cost-benefit analysis.

Plaintiffs' expert testified that the EIS here was deficient in cost-benefit analysis. He made a very convincing presentation as to how this should be done. He then stated that he had not yet read an adequate cost-benefit analysis in an EIS for a transportation project, and that the EIS here was no worse in this respect than the others. He added that the EIS here was about what one would expect given the state of the art at the time it was written.

As federal agencies become more sophisticated in the identification and quantification of environmental impacts, the balancing of costs and benefits, and the comparison of alternatives, they will no doubt develop some standard methodologies that will turn up in new guidelines or policy and procedural memoranda. So far, no particular method of cost-benefit analysis has been decreed for use in an EIS.

 The EIS for (T)H–3 does contain a discussion of the costs and of the benefits of the proposed highway and of certain alternatives. Primitive as it may be, it is no worse than other early attempts in this area. It was not condemned by CEQ or EPA. There is no doubt that the advantages and disadvantages of the project were aired at length and in depth at the section 128 hearings, as reflected in EIS Appendices A and B.

An underlying consideration is that this project assumes the Oahu General Plan. Considerations of costs and benefits went into the development of the Oahu General Plan. It is an authoritative statement of policy. Plaintiffs would have the EIS reflect a reconsideration of the decisions reached in the Oahu General Plan. In fact the Oahu General Plan is now in the process of revision. The same city and state authorities whose concurrence is necessary to

the future of (T)H–3 are involved in this process of revision. The inclusion of the Oahu General Plan in the EIS means a great deal more to them, and to the responsible federal officials, in terms of what it says as to relative costs and benefits of proposed actions than would pages of words or mathematical models.

Some individuals respond to prose, some to mathematics, some to charts. The EIS has some of each method of communication. Taken as a whole, it adequately deals with the costs and benefits of the proposed action and of the alternatives examined.

A.8. The adequacy of the EIS discussion of alternatives.

An EIS must discuss alternatives to the proposed action. Not all possible alternatives need be discussed, but only those alternatives that are reasonably feasible. The alternative of abandoning the proposal must be discussed.

Plaintiffs argue that no meaningful study of alternatives has been made because there had been a commitment in 1965 to construct H–3, and that there is a reasonable and feasible alternative proposed by the City and County of Honolulu which is not discussed in the EIS.

Here again, we are faced with the problem of applying new law to old projects. It is true that a decision was made in 1965 to construct H–3. The decision was reached in accordance with all applicable federal, state, and local statutes, ordinances, regulations, memoranda, directives, and policies, then in effect. The subsequent passage of the several environmental laws has required rethinking and restudying, but could not undo all of the earlier actions.

The consideration of alternatives was not invented by NEPA. Under the earlier procedures and as a result of corridor hearings, the responsible officials changed the original proposal which was to increase the capacity of Likelike Highway, and settled on the route through Moanalua Valley instead, because of the unacceptable socio-economic effects of the original proposal on the residents of Kalihi Valley. It is ironic that the city's alternative proposal would shift back to Kalihi Valley.

The fact is that an alternative not unlike the city's proposal is discussed at length in the EIS. It is also a fact that in the EIS review processes, H–3 was modified to (T)H–3, one of the reasonably feasible alternatives to the original H–3 project.

There is no evidence that there is any other reasonably feasible alternative that should be discussed in the EIS.

Plaintiffs argue that defendants did not put the requisite time and effort into developing alternatives in depth. Assuming this is a requirement of NEPA, the record is to the contrary. Extensive studies of alternative corridors were made in 1964–1965. An alternative to the original corridor was in fact selected. Many of the studies relating to H–3 or (T)H–3 apply equally to the Likelike Highway alternatives.

I find that the EIS contains an adequate discussion of alternatives to the proposed action.

B. Section 128 Hearings

Following the court's order of July 13, 1973, entering partial summary judgment in favor of plaintiffs, new public hearings were held on August 27, 28, 29, 30, and 31, and on September 4, 1973. EIS Appendix B summarizes and discusses the testimony and material received at these hearings.

Plaintiffs are satisfied that defendants have now complied with the provisions of 23 U.S.C. § 128, PPM 20–8, PPM 90–1, and 23 C.F.R. 790, as they relate to public hearings. Accordingly, plaintiffs have withdrawn any further prayer for relief pursuant to the second cause of action in 72–3606.

C. The CCC Process

Section 105 of the Federal-Aid Highway Act commands in paragraph (d)

that in approving programs for projects on the federal-aid urban system, the secretary of transportation "shall require that such projects be selected by the appropriate local officials with the concurrence of the State highway department of each State and, in urbanized areas, also in accordance with the planning process required pursuant to section 134".

Plaintiffs have proceeded on the assumption that (T)H–3 is a project on the federal-aid urban system. This system is defined in section 101 as "the Federal-aid highway system described in subsection (d)" of the section. Subsection (d) refers again to the planning process under section 134.

Actually (T)H–3 is part of the National System of Interstate and Defense Highways described in subsection (e) of section 103. Approval of projects on this system are not specifically required to be selected by local officials or in accordance with the planning process under section 134.

There is also some confusion as to whether (T)H–3 can be considered to be a project in an "urban area" or "urbanized area" as those terms are used in the highway act. It would appear that the federal-aid urban system contemplates routes entirely within urban areas.

On the other hand, an early instructional memorandum required the concurrence of the City and County of Honolulu, and the situation in Hawaii is such that the designation of H–1, H–2, and H–3 as part of the Interstate System would appear to have been more for the purpose of eligibility for federal funds allocated to this system than for the purpose of overriding local concerns.

Assuming that the planning process of section 134 applies to the approval of (T)H–3, plaintiffs argue that the requirements of this section have not been met and that such failure must result in an injunction prohibiting further expenditure of federal funds on H–3. To understand this argument, some exposi-

tion of the section 134 planning process is necessary.

Section 134 mandates that the secretary of transportation "shall not approve under section 105 . . any program for projects in any urban area of more than fifty thousand population unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section." This is known as the 3C process—continuing, comprehensive, cooperative.

The 3C process is spelled out in PPM 50–9. There must be a formal procedure supported by a written memorandum of understanding between the state highway department and the governing body of the local community "for carrying out the transportation planning process in a manner that will insure that the planning decisions are reflective of and responsive to both the programs of the State highway department and the needs and desires of the local communities."

There is such a formal procedure for Oahu. It is known as the OTPP (Oahu Transportation Planning Program). It establishes a policy committee of 4 members—2 from the state and 2 from the city. The memorandum of understanding provides that decisions of the committee shall be reached only upon unanimous agreement.

The planning process includes and requires the development and continuous evaluation of short-range and long-range highway and transportation plans. These plans are to be updated annually. The entire 3C process is to be certified annually by the regional FHW Administrator. Without this certification, the requirements of section 134 have not been met and project approval will not be granted.

Short-range and long-range highway and transportation plans for Oahu were developed beginning with the year 1972. H–3 was duly reflected on both sets of

plans by unanimous agreement of the OTPP policy committee. FHWA certification was duly obtained. The same process was repeated in 1973. Then in 1974 the OTPP policy committee voted 2–2 on H–3 as part of the 1974–1979 short-range plan. All other projects were included or excluded by unanimous vote, but the status of H–3 remained in doubt.

FHWA officials took note of this disagreement and granted conditional certification of the 3C process for 1974–1975. Certain deficiencies in the process were noted, among them the stalemate caused by the unanimous agreement provision of the OTPP. Presumably, if these deficiencies are not corrected, certification will be withdrawn, and all federal-aid highway assistance not already committed will cease.

It is this situation which plaintiffs argue constitutes non-compliance with section 134.

What took place at the policy committee meeting on June 24, 1974 at which H–3 received a vote of 2–2 is disputed. The city's position is that the motion before the body was to include H–3 in the 1974–1979 short-range plan. The state's position is that the motion before the body was to delete H–3 from the 1974–1979 short-range plan. In either case, the motion failed to carry.

 I find from the evidence that the state's position is correct. H–3 is still part of the long-range plan and has not yet been deleted from the short-range plan. Administrative effectiveness requires continuity of decisions reached unless changed by affirmative action.

 Furthermore, the regional FHW Administrator's conditional certification was a reasonable action within his authority under the circumstances. To what extent the city-state dispute may affect FHWA support of (T)H–3 is a matter within the administrative discretion of FHWA officials. So far, the procedural requirements of section 134 have been met.

While plaintiffs withdrew their second alternative claim to the third cause of action, the foregoing discussion relates to both alternative claims.

 Defendants suggest that the OTPP memorandum of agreement is invalidated by the Hawaii State Constitution Article III Section 17. I find no merit in that argument.

### D. The City Charter

H.R.S. § 264–36 requires all federal-aid highway projects to conform to the master plans of the respective political subdivisions of the state.

On Oahu, the master plan adopted in 1964 pursuant to the provisions of the 1959 charter of the City and County of Honolulu is known as the Oahu General Plan. As originally adopted the OGP did not reflect the alignment of H–1, H–2, or H–3. These were added to the OGP by council action on May 21, 1974. At this time, the city charter had been amended. Assuming the requirements for placing the interstate highway system on the OGP would be the same under either the 1959 or the 1973 charter, I find that the process was validly carried out.

The plaintiffs argue that the council failed to take into consideration the matters required by the charter provisions, and failed to meet the requirements imposed by the Hawaii Supreme Court in Dalton v. City and County of Honolulu, 51 Haw. 400, 462 P.2d 199.

 Assuming that I have the jurisdiction to go behind the council's action, I find that the requirements of the city charter(s) and of the *Dalton* case were met and that H–3 is validly part of the OGP.

The council committee's report on the ordinance (to indicate the H–3 highway) reflects extensive study and many hours of public hearings. There are extensive findings of fact. Clearly the council carefully considered the general welfare and prosperity of the residents of the city and the physical, social, economic and governmental conditions and trends involved.

There was evidence that no new socio-economic studies were made in connection with this ordinance. In this connection it is noted that the original OGP contemplated the development of the defense highway systems from Pearl Harbor to Diamond Head and from Pearl Harbor to Kaneohe Naval Station on the Windward side.

### E. Preservation of Parklands

23 U.S.C. § 138 and 49 U.S.C. § 1653(f) prohibit the secretary of transportation from approving any program or project which requires the use of any publicly owned land from a public park or similar area, or any land from an historic site of national, state, or local significance, unless (1) there is no feasible and prudent alternative to such use, and (2) the program includes all possible planning to minimize harm to the area resulting from such use.

Plaintiffs assert that the provisions of these statutes, for ease of reference called the 4(f) requirements, have not been met with respect to (1) the Pali Golf Course, (2) the petroglyph rock Pohaku ka Luahine, and (3) Moanalua Valley.

### E.1. The Pali Golf Course

It is admitted that the Pali Golf Course is a publicly owned recreation area to which section 138 applies inasmuch as some 4 acres from the park will be taken to accommodate an off-ramp.

A 4(f) statement on this use was prepared. On December 3, 1974, the secretary of transportation made the required 4(f) finding. In doing so he had before him not only the separate statement on the Pali Golf Course but also the other volumes constituting the EIS.

■ Plaintiffs argue that the secretary's determination is wholly inadequate. Measured by the standards developed in cases arising under this statute, the secretary's determination of no feasible and prudent alternative and of all possible planning to minimize harm is supported by the record.

The actual taking is of minor proportions. An earlier plan that would have infringed upon the playing area was modified. The use of the golf course is not affected in any manner. If anything, the course is made more accessible to the public. No dislocation of facilities or persons is involved. The 4(f) statement adequately discusses why suggested alternatives are not feasible and prudent.

### E. 2. Pohaku ka Luahine

This petroglyph rock was placed on the National Register of Historic Places on July 26, 1973. It is therefore entitled to the protections afforded by the National Historic Preservation Act.

■ Defendants argue that the rock is not, however, subject to 4(f) requirements because it is an object and not a site.

It is true that the rock was nominated to and placed on the National Register as an object having local significance. Nevertheless, if the rock were still in its original location, I would have no difficulty in interpreting the listing as referring to a site. The evidence is clear, however, that the rock was bulldozed out of its original location and dumped into the stream area along with other rocks and debris several years ago. It was recovered and replaced in its approximate original location. It could just as well be moved again. Being privately owned, it could be removed from the Moanalua Valley entirely. Under the circumstances, I find that 4(f) procedures are not applicable to Pohaku ka Luahine.

It may be noted that the defendants and the owners of the rock had reached a tentative agreement for a satisfactory mitigation of adverse effect on the rock. A memorandum of agreement was prepared but remains unexecuted. If 4(f) procedures do apply, such an agreement would satisfy the provisions of 36 C.F.R. 800.5. No doubt this litigation has delayed further action with respect to such an agreement.

E.3. Moanalua Valley

The issue as to whether 4(f) applies to Moanalua Valley turns upon whether the valley is an historic site of local significance as determined by federal, state, or local officials having jurisdiction thereof.

The valley is privately owned. The project requires the use of land from the valley. Is it "an historic site"?

The section leaves the determination of what is an historic site on private land to "federal, state, or local officials having jurisdiction thereof".

On May 8, 1974, the secretary of interior published his determination that Moanalua Valley "may be eligible" for inclusion on the National Register as a historic place of local significance. On August 5, 1974, the Hawaii Historic Places Review Board determined the valley to be of marginal local significance. The secretary of transportation thereafter determined that 4(f) does not apply to Moanalua Valley.

■■■ Executive Order 11593 and 36 C.F.R. Part 800 make it clear that protection should be afforded to possibly affected possible historic sites at the earliest stages of a project. Hence, the determination by the secretary of interior that a property is eligible for inclusion in the National Register triggers all protections given to a property actually included until the eligibility is resolved. To determine that a property "may be eligible" introduces another level of uncertainty. 36 C.F.R. 800.3(f) refers to a determination that a property is "likely to meet the National Register Criteria."

The secretary of interior has determined that Moanalua Valley is not a property of national historic significance. Who then resolves the question of whether it is of local historic significance? Local officials having jurisdiction over these matters have determined that Moanalua Valley is at best of only marginal historic value.

■■■ Moanalua Valley has received the protections afforded an historic site while this controversy has been going on. Construction of the highway has been enjoined (albeit for other reasons), and the designation of the valley as an historic site has been considered and reconsidered by federal and state officials. The final upshot of all this activity is that Moanalua Valley has not been placed on the National Register nor designated for preservation under state statutes.

I conclude that 4(f) does not apply to Moanalua Valley.

F. Air Quality

Upon conclusion of the trial on the merits, plaintiffs withdrew this cause of action, relating to the requirements of 23 U.S.C. § 109(a) and (j).

G. The National Historic Preservation Act

The National Historic Preservation Act and supporting orders, regulations, instructions, and policies, require the identification and protection of properties of national, state, or local historic significance, and the inclusion of information relating thereto in the EIS.

It is conceded that the NHPA procedures were eventually completed with respect to Pohaku ka Luahine and Moanalua Valley on September 19, 1974. This was two months after the EIS was approved. Plaintiffs argue that this is a violation of PPM 90–1 and CEQ Guidelines which require inclusion of NHPA information in the EIS.

On the other hand, PPM 90–1 refers to material which is pertinent and available, and CEQ Guidelines qualify this suggestion with the phrase "to the extent possible".

Notwithstanding the contention of defendants that Moanalua Valley is not an historic site, NHPA procedures with respect to the valley were completed.

■■■ Nothing in law or reason requires the EIS to be resubmitted to reflect subsequent NHPA compliance.

Plaintiffs raise here again the failure of defendants to identify any other his-

toric properties. In the 10 years that this project has been under consideration, none outside Moanalua Valley that are adversely affected by the project have been seriously brought to the attention of the responsible officials.

H. Project Approval on the Urban System

Instructional Memorandum 50–3–71 instructs the division engineer of FHWA in approving any programs for federal-aid highway projects in an urbanized area to find that certain conditions exist.

 Plaintiffs read this memorandum as requiring a finding that the project has local concurrence and approval. They argue that the city has withdrawn its support of H-3 and therefore the division engineer cannot make the necessary finding.

It is possible to read the memorandum in the sense contended for by plaintiffs. On the other hand, prior actions by the city in supporting H-3 cloud the issue. It would appear that H-3 was selected by local officials and the state highway department in cooperation with each other and that division engineer approvals were given at a time when H-3 was part of a program serving to implement an areawide plan developed within the planning process and held currently valid by the policy board. H-3 was placed on the Oahu General Plan by ordinance of the city council. It is still there. The suspended design contracts were secured at a time when local officials did concur. Construction of the Moanalua-Haiku Segment is a long way off. There is no reason to anticipate violations that have not occurred or to enjoin action that is not clearly illegal.

I do not decide that plaintiffs have no standing to raise this issue, but I do suggest that the proper party to litigate the matter would be the City and County of Honolulu, and that by its failure to object to approvals by the division engineer, it is in effect concurring therein. I am also aware that there may well come a time when FHWA officials will find that the 3C process has broken down on Oahu, at which time they may have to suspend federal-aid to highways until the process is reestablished.

GENERAL CLAIMS

 I have attempted to deal with each claim and argument made by any plaintiff. There was a general claim by plaintiffs that the entire process engaged in by state and federal officials was merely an exercise in justifying what had already been predetermined. As a general proposition, this is probably a valid observation concerning any human endeavor. People hear what they want to hear, see what they want to see. Yet it cannot be said that the pros and cons of H-3 and (T)H-3 have not been widely discussed in great detail.

The ultimate decision to go or not to go remains with the responsible federal, state, and local officials. The court does not decide whether (T)H-3 is a desirable project. Neither does the court decide whether compliance with applicable statutes, regulations, orders, directives, memoranda, charters, and policies could have been better. What the court does decide is whether compliance has been so deficient as to amount to non-compliance as a matter of law. Some of these determinations are simple; others require a balancing of numerous factors.

Three times in this litigation the court has decided that the responsible officials had not complied with the law. The deficiencies noted in those prior decisions have been corrected.

CONCLUSION

Defendants have complied with all applicable requirements of law set out in the complaints in Civil Nos. 72–3606 and 73–3794.

The injunction heretofore entered by stipulation and order on September 15, 1972, and the injunction entered by order on October 18, 1972, should be dissolved.

The foregoing shall constitute the court's Findings of Fact and Conclusions of Law required by Fed.R.Civ.P. 52(a).