The BENTON FRANKLIN RIVERFRONT TRAILWAY AND BRIDGE COMMITTEE, Plaintiff,

v.

Drew LEWIS, Individually and as Secretary of the United States Department of Transportation, City of Pasco, Washington, and City of Kennewick, Washington, Defendants.

No. C–81–547.

United States District Court, E. D. Washington.

Oct. 21, 1981.

Susan Page, Wenatchee, Wash., for plaintiff.

Carroll Gray, U. S. Atty., Spokane, Wash., for defendant, Dept. of Transp.

Leland Kerr, Kennewick, Wash., for defendant, City of Kennewick, Wash.

Greg Rubstello, Pasco City Atty., Pasco, Wash., for defendant, City of Pasco, Wash.

## MEMORANDUM OPINION

QUACKENBUSH, District Judge.

### BACKGROUND

This is an action for declaratory judgment that defendants have violated certain federal statutes. Plaintiff seeks to enjoin demolition of the Old Pasco-Kennewick Truss Bridge (hereinafter the "old bridge"), which was constructed in 1922 and crosses the Columbia River to connect the cities of Pasco and Kennewick, Washington. The old bridge is owned by the cities of Pasco and Kennewick.

The facts are essentially undisputed. Early in the 1970's, area citizens sought replacement of the old bridge. Federal highway funds were made available under the National Bridge Replacement Program, 23 U.S.C. § 144 et seq. This statute required the Secretary of Transportation, in determining federal assistance, to "give consideration to those projects which will remove from service those highway bridges most in danger of failure."

Pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), draft and final environmental impact statements (DEIS and FEIS) were prepared and circulated, and in December of 1973, approved. The FEIS conclusion that the old bridge be demolished was based in part upon the United States Coast Guard's permit for the new bridge construction and the fact the cities did not want the expense of maintaining the old bridge. The old bridge was supported by fourteen (14) piers located across the Columbia River and the Coast Guard, as a condition of its approval required the removal of the old bridge and piers as "hazards to navigation". The new bridge and its supports was erected only 65 feet upstream from the old bridge.

In 1978, erection of the new bridge was completed and opened to traffic. Shortly thereafter plaintiff citizens' group sought to include the old bridge in the National Register of Historic Places. In May of 1979, the bridge was declared eligible for inclusion on the Register. Hence, the requirements of the National Historic Preservation Act of 1966, 16 U.S.C. § 470 et seq., were triggered. Section 470f requires federal agencies proposing to affect objects eligible for Register inclusion to afford the Advisory Council on Historic Preservation reasonable opportunity to comment.

The comment process proceeded during 1979 and 1980 and a memorandum of agreement (MOA) was executed on September 15, 1980 by the Advisory Council, Washington State Historic Preservation Officer, and the Federal Highway Administration (FHWA). The pertinent parts of the MOA provided:

1. The FHWA would not approve funds to assist in demolition of the old bridge if a majority of the voters of the cities of Pasco and Kennewick voted against the demolition.

2. The Secretary of Transportation would conduct a review of the proposed demolition pursuant to Section 4(f) of the Department of Transportation Act, 49 U.S.C. 1653(f), to determine if a feasible and prudent alter-

native to the demolition of the old bridge existed. It was agreed that in the absence of a viable mechanism for maintenance and use of the old bridge, it was in the public interest to proceed with the demolition.

Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 1653(f) states in relevant part:

(f) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development and Agriculture and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

The combined vote by the citizens of both cities on September 16, 1980 was 67.5% to 32.5% in favor of demolition. On October 3, 1980, a draft 4(f) statement was circulated to Federal and State agencies as well as interested local citizens groups, including the plaintiff. The Department of Interior comments recommend the FHWA to engage in concerted federal and local planning for development of adaptive reuse of the old bridge. Following the comments

from these parties, a final 4(f) determination was prepared in February, 1981, and forwarded to the FHWA Regional Federal Highway Administration who issued its final determination on March 10, 1981.

The Administrator found none of the alternatives to be feasible and prudent. The bid for demolition was accepted by the cities, but upon agreement of the parties in open court execution has been delayed pending this court's determination of plaintiff's Motion for Preliminary Injunction. The hearing on plaintiff's Motion for Preliminary Injunction, held September 30, 1981, was by stipulation consolidated with the trial on the merits pursuant to Rule 65(a)(2), Fed.R.Civ.P.

## DISCUSSION

■ The defendants contend that federal court jurisdiction does not exist. Jurisdiction to review 49 U.S.C. § 1653(f) proceedings exists pursuant to 28 U.S.C. § 1331(a) which permits actions against federal defendants in their *official* capacity where a relevant statute exists. *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). Section 1655(h) of Title 49 manifests the legislative intent that the Administrative Procedure Act be applicable to Department of Transportation proceedings. Accordingly, 4(f) determinations by the Administration of FHWA are reviewable agency actions since such proceedings are not otherwise committed to agency discretion, and the Department of Transportation Act does not otherwise preclude judicial review. *Standard Oil Co. of California v. F.T.C.*, 596 F.2d 1381 (9th Cir. 1979), *rev'd* on other grounds, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980).[1]

■ Defendants also challenge plaintiff's standing to bring this action. The court concludes that the plaintiff has standing to maintain this action under Section 4(f). The current definition of standing is

---

1. See *Standard Oil*, also, for the proposition that a "proceeding" is an "agency action" within the meaning of 5 U.S.C. § 551(13) since the term is to be given a liberal definition and includes any agency disposition that is "final".

*F.T.C. v. Standard Oil*, 449 U.S. 232, at 238 n.7, 101 S.Ct. 488, at 492, 66 L.Ed.2d 416; *Standard Oil v. F.T.C.*, 596 F.2d at 1384–85. The determination in question in the present action is undisputedly "final".

two-pronged. First, in its constitutional dimension, there must be justiciability, that is, a case or controversy within the meaning of Article III of the United States Constitution. Hence, the plaintiff must allege "some threatened or actual injury resulting from the putatively illegal action", *Warth v. Seldin*, 422 U.S. 490, 499–50, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Secondly, apart from the Article III requirement, the statutory provision must be understood as granting persons in plaintiff's position a right to judicial relief ("zone of interest" requirement). 422 U.S. at 500, 95 S.Ct. at 2205. So long as these two prerequisites are met, plaintiff may invoke the general public interest in support of its claim. *Id.* The allegation in the present complaint that the bridge is necessary to complete a *trailway* which plaintiff "seeks to establish" is insufficient to satisfy the "injury in fact" requirement. *River v. Richmond Metropolitan Authority*, 359 *F.Supp.* 611, 624 (E.D. Va.1973), *aff'd*, 481 F.2d 1280 (4th Cir. 1973). However, the assertion in the complaint that members of the organization "presently enjoy" the bridge as a *historical* structure is minimally sufficient to satisfy the first standing requirement.

■ The second prong of the standing definition presents a more difficult question. The City of Pasco asserts that the old bridge is merely an historic "object" but not an historic site within the meaning of 4(f) which the cities contend is implicated only in D.O.T. projects involving use of "land" from the historic site. Hence, it is argued, although preservation of the historic bridge is within the "zone of interest" of 16 U.S.C. § 470f which gives *limited* protection to an historic "site, building, structure or object", such preservation is not within the interest zone of Section 4(f), 49 U.S.C. § 1653(f), which gives broader protection than 16 U.S.C. § 470f but only speaks to the "natural" beauty of historic sites and not to "manmade" beauty. Thus, although a 4(f) determination was made in the present case, the cities assert that it was not required. The federal defendants merely ar-

gue that it has always been their policy to conduct a 4(f) determination for affected historical sites regardless of whether the determinations are legally required. The court has carefully considered the briefs of counsel and evidence as well as the 4(f) cases discussing the definition of "historical site" within the meaning of the statute in question. None of the cases or regulations are precisely on point. In this respect, see *Stop H–3 Association v. Coleman*, 389 F.Supp. 1102, 1116–7 (D. HI 1974) (*Coleman I*), *rev'd*, 533 F.2d 434, 445 (9th Cir. 1976) (*Coleman II*); *Coalition for Responsible Reg. Div. v. Coleman*, 555 F.2d 398 (4th Cir. 1977); *Pennsylvania Environmental Council, Inc. v. Bartlett*, 454 F.2d 613, 621 (3rd Cir. 1971).

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 412 at n.29, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971) instructs that the legislative history of 4(f) is ambiguous. Hence, the court must look to the statute itself to find the legislative intent. *Id.* The court concludes that the "natural beauty" language of the statute does not require the result urged by the defendant cities. Consequently, the court finds that the old bridge is an historical site within the meaning of Section 4(f).

■ At this juncture, it is appropriate to discuss the second claim in the complaint. Plaintiff alleges violation of the national policies outlined in 23 U.S.C. § 109(n), 23 U.S.C. § 134(a), and 23 C.F.R. § 1204.4. Section 109(n) requires that the Secretary not approve a project that will destroy a major nonmotorized route unless a reasonable alternative route exists. Not only does the record not reflect whether the old bridge was a major route, but it is undisputed that the new route accommodates such travel. Section 134(a) requires transportation planning in certain urban areas. The court is unable to ascertain how this statute is applicable in the present case. Indeed, there is no allegation to sufficiently state that the Pasco-Kennewick area is "urban" within the meaning of the statute. Finally, the plaintiff cites the 62-page regu-

lation, 23 CFR § 1204.4. The court is unable to ascertain what applicability this regulation has to the case at bar or how it was violated, especially since it is the State of Washington's and not the present defendants' responsibility to implement the regulation policies.

██ The court cannot help but observe that the complaint unblushingly alleges the private plaintiff committee was organized to develop a trailway system, and not to preserve an historical site. The record shows the trailways dream to be speculative. It is well settled law that "[i]n the absence of an active, as distinguished from a purely speculative, proposal from a responsible public agency, with power and responsibility in the area", Sec. 4(f) is inapplicable. *See, e.g., Coalition for Responsible Regional Development v. Coleman*, 555 F.2d 398, 402 (4th Cir. 1977). Hence, the only way plaintiff survives the standing hurdle is through its historical allegations although its main purpose for organization is otherwise.

██ Having determined that this court has jurisdiction to review the 4(f) determination and the plaintiff has standing to challenge this final agency action, it is necessary to delineate the scope of review. *Overton Park* states that the Administrator's final determination, which is entitled to a presumption of regularity, must not be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 401 U.S. at 415–16, 91 S.Ct. at 823. The court must decide whether the relevant factors were considered and whether a clear error of judgment was made. *Id.*

██ Finally, although the factual inquiry must be searching, the standard of review is a narrow one, and the court may not substitute its judgment for that of the agency. *Id.* Moreover, this court must make its decision upon "the full administrative record that was before the [Administrator] at the time he made his decision", and not upon post hoc affidavits. 401 U.S. at 419–20, 91 S.Ct. at 825.

██ The court has reviewed the full administrative record. Plaintiff contends the Administrator's 4(f) determination, that there were no feasible or prudent alternatives to the use of the historic bridge and that there had been all possible planning to minimize harm, was arbitrary, capricious and an abuse of discretion. Distilled to its essence, the fundamental issue becomes whether the Administrator's consideration of the vote of citizens constitutes a decision based upon an irrelevant factor. Stated another way, the question is whether the cities having accepted federal aid to build a new bridge may properly refuse to fund the rehabilitation and maintenance of the old bridge as an historical site.

In this respect, the court has carefully considered *Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept.*, 446 F.2d 1013 (5th Cir. 1971). In *Named Individual Members*, the court, citing to *Citizens to Preserve Overton Park*, held that Congress did not intend to leave the decision of whether federal funds would be used to build highways through local parks up to the local city councils. 446 F.2d at 1024. Of the voter mandate, the court observed:

> The State relies on this clipping, and others, to show that the voters of San Antonio knew what they were voting on when they voted on the Bond issue in 1961. Thus, they seem to argue, since the voters of San Antonio decided to finance part of the right-of-way for this highway in 1961, the controversy ended at that point, and we should deter to that determination. Even if the voters of San Antonio did know what they were voting on, however, the bond issue election was only the first step in a long series of steps necessary to obtain approval for the highway; as such it was but the first battle in the long war over this highway. And, as the history of this case demonstrates so vividly, the war is not over until the last battle has been won.

446 F.2d at 1015, n.1. See, also, 446 F.2d at 1025, n.23. Finally, the court reasoned that under the Supremacy Clause, a state's willingness to go ahead with a project with its

own funds regardless of the validity of the federal action does not thwart the court's power to require State compliance with the law. To allow the State to proceed with its own money, it was reasoned, would be giving approval to the circumvention of an Act of Congress. The State having voluntarily entered into partnership with the federal government, regardless of whether funding had yet changed hands, was thereafter bound by federal law. 446 F.2d at 1027.

The present case is unique and is distinguishable from the Texas case. Certainly, federal law applies. Demolition of the replaced bridge is an inseparable segment of the federal project. However, in the present case, no one argues whether the placement of the new bridge was prudent. In fact, it is undisputed that the new bridge was much needed and that its proximity is appropriate, unlike the Texas case. Nor does a serious problem arise in the mere retention of the old bridge. According to the record, the problem arises because retention of the old bridge will require a new and separate outlay of money to maintain the bridge and finance liability insurance for the life of the bridge, and the bridge owners, the citizens of the cities, are unwilling to take on this new financial burden. To allow the historical bridge to remain, without spending tax dollars each year for maintenance, would assuredly cause the bridge to become a navigational hazard; from among other things, lack of lighting and the danger of complete failure. The record and relevant statutes, *e.g.*, The National Bridge Replacement Program, 23 U.S.C. § 144, indicate that in all probability, federal funds could not or would not be used to finance the new historical property. The second reflects that no private funding exists for the proposed preservation of the historic bridge.

This is not a case of simply issuing a permanent injunction to maintain the status quo. That is, this court is being asked to order the cities to act affirmatively and not simply to desist acting. Nor is this a case, as in the Texas action, of the court, under the Supremacy Clause, dictating to the state that it must alter the course of a new highway thus necessitating expenditure of greater joint federal and state funds. The relief requested requires the court to delve deeply into the Eleventh Amendment. Here, to find the Administrator's determination unreasonable is to dictate to the cities that they must finance for an indeterminable period of time new expenditures which the vast majority of citizens do not desire. Clearly the citizen vote here regarding how to spend their own funds, as yet ungenerated, is different from the Texas vote where the citizens were determining the initial placement of a new highway and how to spend federal funds. Surely, the Supremacy Clause does not reach so far.

■ The plaintiffs contend that the FHWA has capitulated its responsibilities under section 4(f) of the Act by alluding to the 67.5% vote of the people in favor of demolishing the bridge. Plaintiffs state that consideration of this vote in the 4(f) analysis violates the rules set down in *Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept.*, 446 F.2d 1013 (5th Cir. 1971), which prohibit the 4(f) determination from being solely based upon a local vote or decision. These decisions, however, do not prohibit the FHWA from considering the cities' unwillingness to provide any funds to maintain the old bridge, which is the only alternative to demolition.

The owners of the bridge, the cities of Pasco and Kennewick, Washington have evidenced a strong position that they will not spend any funds of their municipalities to rehabilitate and maintain the bridge. These costs are estimated by plaintiffs at p. 4 of their response to the draft 4(f) statement as $65,000.00 for bridge pier lighting and $13,000.00 for other required rehabilitation expenses in addition to annual maintenance costs. As the court suggested during oral argument, in view of the 67.5% vote of the citizens of the cities of Pasco and Kennewick in favor of demolishing the bridge, one would not expect members of the respective city councils to appropriate monies

to maintain the bridge. The resulting "alternative" would thus be an old bridge continuing to deteriorate with commensurate liability exposure to the cities and risk to navigation by reason of the 14 remaining piers without proper lighting.

The plaintiff's contention that the Administrator's failure to consider an alleged willingness on the part of the Coast Guard to reconsider its "hazard to navigation" position evidenced a failure to "include all possible planning" is without merit since that willingness, if any, was subject to an application for reconsideration being filed by the cities. The cities' position clearly stated their desire for removal of the bridge and the 14 piers. All possible planning was done. All interested parties, including the plaintiff committee, were given the opportunity to suggest alternatives and to comment upon the initial and final evaluations. All possible suggested alternatives were considered. Only speculative alternatives were proposed. No feasible or prudent alternative was proposed or existed. Federal law does not require the Administrator or this court to decide matters such as this on hypothetical suggestions. The Administrator fully complied with Section 4(f) and his determination was not arbitrary, capricious, or clearly erroneous. This court cannot and will not substitute its judgment for that of the Administrator.

The foregoing shall constitute the court's Findings of Fact and Conclusions of Law. The complaint of the plaintiff is DISMISSED with prejudice.